J. Daniel **LUGOSCH, III; Robert L. Ungerer; John A. Bersani; Edward A. Kellogg; John C. Charters; Peter C. Steingraber; Richard K. Askin and William Tapella, Plaintiffs,**

v.

**Robert J. CONGEL, individually and as General Partner of Woodchuck Hill Associates, Riesling Associates, Madeira Associates and Moselle Associates; Pyramid Company of Onondaga; Eklecco L.L.C.; Woodchuck Hill Associates; Riesling Associates; Madeira Associates; Moselle Associates; James A. Tuozzolo; Robert Brvenik; Marc A. Malfitano; and Scott R. Congel, Defendants.**

No. 00–CV–0784 (NAM/RFT).

United States District Court,
N.D. New York.

Oct. 17, 2003.

Jeffrey S. Shelly, Michael I. Endler, Boies, Schiller Law Firm, Donald T. Kinsella, Green, Seifter Law Firm, Albany, NY, Daniel J. French, Green, Seifter Law Firm, Syracuse, NY, for Plaintiffs.

Nancy L. Pontius, Mackenzie, Stephen T. Helmer, Mackenzie, Hughes Law Firm, Edward Gerald Melvin, Costello, Cooney Law Firm, Syracuse, NY, David J. Hensler, Lisa Bonnano, Hogan, Hartson Law Firm, Douglas N. Greenburg, PHV, Michael Kevin Atkinson, PHV, James E. Sharp, PHV, Winston, Strawn Law Firm, Michael J. Ciatti, David R. Weiser, phv, John M. Bray, King, Spalding Law Firm, Jeffrey Adam Rosen, phv, Laura Rebecca Bach, phv, James P. Gillespie, phv, Kirkland, Ellis Law Firm, Washington, DC, Michael J. Cunningham, Iseman, Cunningham Law Firm, Albany, NY, Eric T. Dadd, Dadd, Nelson Law Firm, Attica, NY, Paul F. Ware, Jr., phv, Anthony S. Fiotto, Goodwin, Christopher David Moore, PHV, Goodwin, Kai W. Lyman, phv, Goodwin, Proctor Law Firm, Boston, MA, Patricia A. Griffin, King, Spalding Law Firm, New York City, Charles C. Swanekamp, Jaeckle, Fleischmann Law Firm, Buffalo, NY, for Defendants.

## MEMORANDUM DECISION AND ORDER

TREECE, United States Magistrate Judge.

Plaintiffs received from Defendant Moselle Associates (hereinafter "Moselle") a redacted version of an investigatory report prepared by a criminal defense firm retained by this Defendant entitled, *"Report On Pilot Bill Issues At the Carousel Center,"* dated March 18, 2003. Now, Plaintiffs seek a copy of the investigatory report unredacted and all of the underlying documents and notes. Moselle contests this disclosure based upon the grounds of confidentiality and that there is a lack of relevancy. By an Order dated September 5, 2003, this Court directed Defendants[1] to provide under seal for an *in camera* review the entire report in question. Dkt. No. 265 at p. 4. Furthermore, the Court established a timetable for the litigants to submit letter-memoranda and exhibits in support of their respective positions.[2] *Id.*

---

1. All of the other Defendants in this case share and support Moselle's positions in this case. The Defendants participate in a joint representation agreement pursuant to the common interest doctrine and in some respect may have viewed the report in question.

2. In support of Plaintiffs' application for this investigatory report, the Court will consider: (1) Jeffrey Shelly, Esq., letter-memorandum dated September 12, 2003 with thirteen exhibits.

In support of Defendant Moselle's opposition to this application, the Court will consider: (2) Stein, Mitchell, Mezines, Attorneys at Law, letter dated September 12, 2003; (3) Anthony Fiotto, Esq., letter-memorandum dated September 12, 2003 with five exhibits; and (4) Christopher D. Moore, Esq., letter dated September 30, 2003.

Both parties filed their respective letters and letter-memoranda under seal pursuant to the March 14, 2001 Confidentiality Order. Dkt. No. 55. There is a provision within this Order which precludes dissemination of confidential material as a public record and further directs that pleadings and motions filed with the Court containing this confidential material also be submitted under seal. *Id.* at ¶ 12. The Court feels that the parties' sealing of not only the confidential matter but the factual and legal discussion therein is an overly broad application, if not a possible misapplication, of this confidentiality order. Moreover, filing records and pleadings under seal may fly in the face of the Second Circuit's overall policy not to seal pleadings unless extraordinary circumstances warranted such sealing. *See Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 307 (2d Cir.1997). In this matter, pursuant to an Order dated September 5, 2003 (Dkt. No. 265), we sought the original investigatory report only under the cloak of a seal for an *in camera* review. But for this investigatory report being shared with Plaintiffs, albeit in redacted form, with the explicit understanding that the production of the redacted report would not constitute a waiver of any privilege, the Court would have directed the Clerk of the Court to docket these letters and letter-memoranda. Fiotto It. dated Sept. 12, 2003 at p. 7. However, since considerable effort has been taken between the parties to maintain this document's claimed privileges, and considering that the Court will not direct disclosure of the full report, we will abide by the restrictions placed upon these pleadings and direct the Clerk

For all of the foregoing reasons, Plaintiffs' Motion to Compel disclosure of this investigatory report unredacted and the underlying notes is Denied.

## I. BACKGROUND

### A. Making of the Muse Report

The genesis for this investigatory report (hereinafter Muse Report) commenced with the miscalculation of tax payments assigned to Carousel Center Mall's tenants including the retail concern, The Limited. The Limited is a major tenant at most, if not all, of the Pyramid Malls including the Carousel Center which is located in Syracuse. Moselle is the majority partner in Defendant Pyramid Company of Onondaga (PCO), which has ownership interest in Carousel. The other major partners in PCO are Bruce Kenan and Defendant Robert Congel. None of the Plaintiffs in our case are partners in PCO. Succinctly, The Limited challenged Carousel Center's calculations of its allocable share of the Pilot Bills [3] and the underlying documentation supporting the calculation.

In the past, the City of Syracuse would provide Carousel Center with two separate Pilot Bills delineating between the amounts related to the Mall level (above ground) and common areas (below ground). The Pilot Bill for the common areas was always less than that for the Mall levels. Apparently, in 1994 the City discontinued the practice of sending two separate bills for Pilot costs and combined the costs into one annual bill. In order to continue allocating respective shares of the Pilot Bill consistent with past practices, the lease administrator created a bill template which showed the applicable amounts for each level of the Mall. This template was, in essence, a phony bill notwithstanding how honorable the intentions were to aid in the allocation of these costs. From 1994 to 2000, the lease administrator or administrators used this template to allocate the share of the Pilot Bill to each of Carousel's tenants.

Through an audit, The Limited discovered errors in Carousel's calculations of the allocable Pilot Bill payments. Concurrently, it was also at this time that the Pilot template was ascertained to be a false "City" document. The Limited and Carousel settled their differences and The Limited was given a refund of approximately $817,763.

In August 2002, Moselle hired the criminal defense firm of Stein, Mitchell and Mezines to investigate how this false Pilot Bill was created and used. Robert F. Muse, Esq., was assigned the task of conducting this investigation with the mission of determining why a false Pilot Bill was created, who did it, and at whose direction, if any. The investigation findings were reported to Moselle in a report dated March 18, 2003.

### B. Disclosure of the Muse Report

In prosecuting their action, on or about May 23, 2002, Plaintiffs uncovered the issue of the false Pilot Bill and gathered relevant documents from the City of Syracuse. In addition, Plaintiffs subpoenaed records from The Limited in June 2002 and obtained The Limited's entire audit file and possibly other documents and records related to this issue. As previously stated, Moselle did not seek an investigatory report until August 2002. Additionally, throughout this larger than life discovery process, Plaintiffs have been provided with records, documents, and media interviews that refer specifically to or lead to other documents that pertain to the false Pilot Bill morass. After having a firmer understanding of the Pilot Bill matter, Plaintiffs sought the production of any report concerning such Pilot Bills. Initially, Moselle resisted disclosing the report arguing that the report was not relevant to the Plaintiffs' claims against the Defendants and moreover was confidential. Ultimately, by a letter dated July 25, 2003, Moselle agreed to provide Plaintiffs with a redacted version of the Muse Report, provided Plaintiffs agree that this production of the Report would not waive any objection with respect to either

---

of the Court to maintain these pleadings in a sealed file. Nonetheless, sufficient facts from those pleadings and exhibits must be discussed herein in order to render this Decision and Or-

der. We will do so however without specific reference to the parties' submissions.

**3.** Pilot stands for payments in lieu of taxes.

relevancy or privilege and that it was being disclosed pursuant to a confidentiality order. The confidentiality order to which the parties were referring to is an Order dated March 14, 2001, issued by former Magistrate Judge Ralph S. Smith. Dkt. No. 55.

Several of the Defendants who were recently deposed were questioned extensively about the Pilot Bill issue. In making their inquiries, Plaintiffs employed records they obtained through discovery and explored with these party-witnesses the Muse investigation. Two of the principal owners of Carousel Center, particularly Defendants Marc Malfitano and Robert Congel, gave interviews to the press who were also investigating the Pilot Bill matter. Partly because of the disclosure of the heart and soul of the Muse Report, the depositions' inquiries, and the interviews with the press, Plaintiffs assert that any privileges cloaking the Muse Report are now waived. Defendants hold steadfast that the Muse Report is not relevant to this lawsuit and that neither the attorney-client privilege nor the work product doctrine have been waived.

## II. DISCUSSION

### A. Relevancy

■ The scope of discovery in federal lawsuits is significant and broad. FED. R. CIV. P. 26(b)(1) states in pertinent part that:

parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party .... For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action .... Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.

The 2000 Amendments to this discovery statute created a two tier analysis of what is to be disclosed. When the discovery is party controlled, relevancy is guided by whether it relates to the claims and defenses plead. FED. R. CIV. P. 26(b)(1) advisory committee's notes 2000 Amend. However, authority by the court to grant broader and more flexible discovery is still retained. In this regard

when the court's authority is invoked, relevancy revolves around good cause being shown and that the requested matter is relevant to the subject matter involved in the case. *Id.; In Re Surety Ass'n*, 388 F.2d 412, 414 (2d Cir.1967) ("The only restriction placed upon the matters which may be gone into upon discovery examinations is that they be relevant."). Considering the court's inherent powers to regulate discovery and permit discovery of information relevant to the subject matter, discovery then, in a sense, is more expansive and liberal, guided by the reasonable needs of the case. The burden of establishing relevancy is on the party seeking the disclosure. *See A.I.A. Holdings S.A. v. Lehman Brothers*, 2000 WL 763848, at *3 (S.D.N.Y. June 12, 2000).

■ To be relevant, the request for information must be "germane" to the subject matter of the claim, defenses or counterclaims, though not necessarily limited by such pleadings, and is not controlled by whether it will be admissible at trial. *Surety Ass'n*, 388 F.2d at 414 ("[P]arties should not be permitted to roam in the shadow zones of relevancy and to explore matter which does not presently appear germane on the theory that might conceivably become so."); *Johnson v. Nyack Hosp.*, 169 F.R.D. 550, 556 (S.D.N.Y.1996). However, the demarcation between what information is relevant to the claims and defenses and relevant to the subject matter cannot be defined with precision. FED. R. CIV. P. 26 comm. notes 2000 Amend; *see also Shang v. Hotel Waldorf-Astoria Corp.*, 77 F.R.D. 468 (S.D.N.Y.1978) (when drawing boundaries that define information that is relevant to the subject matter involved in the action, there is no way to state a general rule by which boundaries can be drawn). Thus, the court must weigh a host of factors to determine relevancy and reasonableness. *See Surety Ass'n*, 388 F.2d at 414 (the trial judge has considerable discretion on the issue of relevancy).

■ Since the Court's role in determining relevancy on the subject matter has not changed since the 2000 Amendment, except for the party seeking the discovery having to show good cause, we are permitted to seek some guidance from precedents prior to

these amendments. A court may restrict discovery to the claim and defense, but it need not. The court is permitted, depending on the nature of the case, to broaden the scope of discovery. In this vein, the requirement of relevancy with regard to discovery matters should be construed liberally and with common sense. *In re Agent Orange Product Liability Litig.*, 98 F.R.D. 558, 559–60 (E.D.N.Y.1983); *see also Kerr v. United States District Court*, 511 F.2d 192, 196 (9th Cir.1975), *aff'd* 426 U.S. 394, 397–99, 96 S.Ct. 2119, 48 L.Ed.2d 725 (1976) (there has been explicit recognition that the question of relevancy is to be more loosely construed at the discovery stage than at trial).

■ As previously stated, Defendants contend that the request for the Muse Report is irrelevant to the claims and defenses within this all encompassing and ever expanding litigation. However, their argument is belied by the facts, inasmuch that this lawsuit has a myriad of claims including, *inter alia*, breach of contract, fraud, and Civil RICO. Because Plaintiffs are not partners of the Carousel Mall and this Pilot Bill issue does not affect any malls in which Plaintiffs are partners, Defendants contend that the Muse Report is not germane to this action. Plaintiffs' countervailing argument is that they pled in their Second Amended Complaint that Defendants, as a part of a pattern of racketeering, overcharged tenants for such things as common area costs. Dkt. No. 185, Second Amend. Compl., at ¶¶ 72 & 128.[4]

Whether Plaintiffs are partners directly within this particular partnership is of no moment. It is counterintuitive that the Plaintiffs have pled a theory of liability that encompasses, to some degree, the issue of over charging or problematic charging of tenants, which may in some form, impact upon the malls operated by both Plaintiffs and Defendants. For example, The Limited is an ubiquitous tenant within the Pyramid Mall infrastructure, and their dissatisfaction with the Pilot Bill issue may have or had some repercussions for all parties. Further, this information is relevant in that it may lead to other admissible evidence especially where culpability and the degree of culpability, if any, is in dispute. *See Riverwoods Chappaqua Corp. v. Marine Midland Bank*, 30 F.3d 339, 345 (2d Cir.1994) (evidence of similar bad acts are admissible in Civil RICO action because intent was in dispute). The Plaintiffs have met their burden of good cause shown and the Court finds the requested information relevant. We must next determine whether there are privileges attached to the Muse Report, and if so, whether have been waived.

### B. Attorney–Client Privilege

■ The Muse Report, prepared by a criminal defense firm retained by the majority partner in Carousel Center (Moselle), is cloaked by the attorney-client privilege. The attorney-client privilege is a longstanding common law privilege recognized in New York and by the federal courts under FED. R. EVID. 501. This privilege attaches to communications (1) where legal advice of any kind is sought, (2) from a professional legal advisor in his or her capacity as such, (3) the communication relates to that purpose, (4) made in confidence, (5) by the client, (6) are at his or her insistence permanently protected, (7) from disclosure by the client or the legal advisor, (8) except if the protection is waived. *United States v. Int'l Broth. of*

4. Plaintiffs ask us to read paragraphs 72 and 128 of the Second Amended Complaint together:

 Fundamental to the fraudulent and illegal scheme that Defendants perpetrated upon Plaintiffs and the other Partners was, and is, the provision of false and/or misleading information. This long-term, ongoing cover-up allowed Congel and the other Defendants to siphon off millions of dollars otherwise due to the Plaintiffs and the other Partners.

 and

 The Partnerships' relationships with key shopping center industry tenants has also been irreparably damaged by the actions of Congel, Pyramid and the other Defendants. Many tenants have brought suit against Congel, Pyramid and the Partnerships over the past five to eight year period, when evidence of management fee over charging and tenant billing overcharges became evident. In response, Pyramid has settled virtually every such case at great expense, in some instances releasing tenants from lease obligations at Partnership Properties in exchange for litigation releases and/or new leases for unrelated projects including Palisades.

 Dkt. No. 185.

*Teamsters,* 119 F.3d 210, 214 (2d Cir.1997); *Madanes v. Madanes,* 199 F.R.D. 135, 151 (S.D.N.Y.2001); *see also* 8 Wigmore, Evidence § 2292. This privilege further attaches to the advice rendered by the attorney. *In re Six Grand Jury Witnesses,* 979 F.2d 939, 943–44 (2d Cir.1992). Its essential purpose is to encourage clients to be fully forthcoming with their attorney and to protect the client's legal rights. *Asian Vegetable Research & Dev. Ctr. v. Institute of Int'l Educ.,* 1996 WL 14448 (S.D.N.Y. Jan.16, 1996). "However, since the privilege has the effect of withholding relevant information from the factfinder, it applies only where necessary to achieve its purpose." *Fisher v. United States,* 425 U.S. 391, 403, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976); *see In re Horowitz,* 482 F.2d 72, 81 (2d Cir.1973) (privilege ought to be strictly confined within the narrowest possible limits consistent with the logic of its principle) (citing 8 Wigmore § 2291 at 554); *United States v. Int'l Broth. of Teamsters,* 119 F.3d at 214. And there can be no dispute that a corporation's "in-house counsel" is afforded the same protection as an outside counsel with respect to this privilege (*Upjohn Co. v. United States,* 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981)), nor is the privilege waived just because he or she is no longer employed as such.

The Court's only reservation to whether the Muse Report is fully cloaked by the attorney-client privilege pertains to the investigation that includes interviews of Carousel Center's partners' past and present employees. Factual investigations by an attorney or its agents, which include gathering statements from employees, clearly fall within the attorney-client rubric. *Upjohn Co. v. United States,* 449 U.S. at 390–91, 101 S.Ct. 677; *U.S. v. Davis,* 131 F.R.D. 391, 398 (S.D.N.Y.1990) (citing *Upjohn Co.* for the proposition that the attorney-client privilege encompasses factual investigations). The Supreme Court observed that attorneys dealing with a complex legal problem such as this are thus faced with a 'Hobson's choice'. If he interviews employees not having 'the very highest authority', their communications to him will not be privileged. If, on the other hand, he interviews *only* those employees with the 'very highest authority,' he may find it extremely difficult, if not impossible, to determine what happened.

*Upjohn Co.* 449 U.S. at 391–392, 101 S.Ct. 677 (citations omitted).

That being so, statements made by employees, of any station or level within a corporation or a sophisticated business structure, to an attorney or the attorney's agent which were done in confidence and outside the purview of others are protected. *Bruce v. County of Rensselaer,* 2003 WL 355460, at *2 (N.D.N.Y. Feb.11, 2003); *United States v. Davis,* 131 F.R.D. at 398. And, if the attorney-client privilege extends to employees' statements surely it extends to the attorneys' notes, memoranda, and files pertaining to those statements. *Upjohn Co.,* 449 U.S. at 388–90, 101 S.Ct. 677 (questionnaires submitted to corporate employees not disclosed); *Carter v. Cornell Univ.,* 173 F.R.D. 92, 94–95 (S.D.N.Y.1997) (interview notes not disclosed). Thus, the Muse Report has attorney-client privilege status but we must inquire further whether such privilege has been waived. *See* Part II.D, *infra.*

### C. Work Product Doctrine.

■ The work product privilege is more broad than the attorney-client privilege. *In re Grand Jury Proceedings,* 219 F.3d 175, 190 (2d Cir.2000). This privilege exists to protect attorneys' mental impressions, opinions, or legal theories concerning litigation. *Horn & Hardart Co. v. Pillsbury Co.,* 888 F.2d 8, 12 (2d Cir.1989). Indeed, the work product privilege is designed to protect an adversary system of justice and has been analyzed in that context by the Supreme Court in *Hickman v. Taylor,* 329 U.S. 495, 510–11, 67 S.Ct. 385, 91 L.Ed. 451 (1947). This doctrine establishes a "zone of privacy" in which a lawyer can prepare and develop theories and strategies with an eye towards litigation free from unnecessary intrusion by his or her adversaries. *United States v. Adlman,* 68 F.3d 1495, 1501 (2d Cir.1995) (citing *Hickman v. Taylor,* 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947)); *see also In re Minebea Co. Ltd.,* 143 F.R.D. 494, 499 (S.D.N.Y.1992). Of course the burden, albeit not a heavy one, of establishing that the work

48

product doctrine applies rests with that party's attorney. The doctrine is invoked as soon as the attorney, in responding to a request for production of documents, serves upon the requesting party a privilege log asserting this and any other relevant privileges or provides notification that it will not be disclosed for this reason. FED. R. CIV. P. 26(b)(5) & 34(b). Failure to timely provide the privilege log or objection constitutes a waiver of any of the asserted privileges. Notwithstanding following these steps, the security of the work product doctrine is not assured. There must be the omnipresent concern that revealing the attorney's mental processes is real and not just speculative. *Gould Inc. v. Mitsui Mining & Smelting Co. Ltd.*, 825 F.2d 676, 680 (2d Cir.1987).

FED. R. CIV. P. 26(b)(3) provides the relevant rule on the discovery of work product material. It reads in part:

[A] party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against the disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

It is important to note that the work product doctrine classifies documents into two categories: "non-opinion" work product and "opinion" work product. The distinction between these two categories turns on the effort employed in obtaining disclosure pursuant to Rule 26(b)(3). For "non-opinion" work product, the party seeking this information must show a substantial need for the document and undue hardship to acquire the doc-

ument or its substantial equivalent by other means. On the other hand, "opinion" work product requires a higher protection to the extent that the requesting party has to demonstrate extraordinary justification before the court will permit its release. *Strougo v. BEA Associates*, 199 F.R.D. 515, 521 (S.D.N.Y.2001) (citing *In re Sealed Case*, 676 F.2d 793, 809–10 (D.C.Cir.1982)); *see also Upjohn Co. v. United States*, 449 U.S. at 401, 101 S.Ct. 677. At a minimum, such "opinion" work product should remain protected until and unless a highly persuasive showing is made. *In re Grand Jury Proceedings*, 219 F.3d at 191; *United States v. Adlman*, 134 F.3d 1194, 1204 (2d Cir.1998) (*Adlman II*). In a similar vein, in most instances, the work product doctrine does not extend to facts. Generally, non-privileged facts should be freely discoverable. *Compare In re Savitt/Adler Litig.*, 176 F.R.D. 44, 48 (N.D.N.Y. 1997) *with In re Grand Jury Subpoena Dated Oct. 22, 2001*, 282 F.3d 156, 161 (2d Cir. 2002).

"Where a party faces the choice of whether to engage in a particular course of conduct virtually certain to result in litigation and prepares documents analyzing whether to engage in the conduct based on its assessment of the likely result of the anticipated litigation, [it should be] conclude[d] that the preparatory documents should receive protection under Rule 26(b)(3)." *United States v. Adlman (Adlman II)*, 134 F.3d at 1196. The crux being that a document which has been prepared because of the prospect of litigation will not lose its protection under the work product doctrine, even though it may assist in business decisions. *United States v. Adlman*, 68 F.3d at 1502; *Strougo v. BEA Assoc.*, 199 F.R.D. at 521. But this protection will not be extended, under any circumstances, to records that are prepared in the ordinary course of business. *Adlman*, 68 F.3d at 1502. Even though the work product doctrine protects the impressions, opinions, theories, and strategies of an attorney, Rule 26(b)(3) makes clear that the document at issue either obtained or prepared by or for a party, or by or for his representative may be cloaked by this doctrine as well. *Id.* This maxim makes sound sense considering how complex litigation can be and the undeniable

need for others to assist in developing all that is necessary to prosecute or defend a lawsuit. Obviously, impressions and strategies are not always created in a vacuum, but rather are generated in cogent discourse with others, including the clients. The exchange of such documents and ideas with those whose expertise and knowledge of certain facts can help the attorney in the assessment of any aspect of the litigation does not invoke a waiver of the doctrine. *United States v. Nobles,* 422 U.S. 225, 239, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975); *United States v. Adlman,* 68 F.3d at 1502.

Defendants contend that they have provided certain documents to the Plaintiffs which are related to the issues and facts pertaining the Pilot Bill issue and the disagreements with The Limited. This disclosure includes a redacted copy of the Muse Report. Furthermore, Plaintiffs acknowledged receipt of these related documents and the redacted report and also advise the Court that they have received many other related documents from the City of Syracuse and The Limited directly. Moreover, Plaintiffs availed themselves of depositions of the Defendants on these very same issues. *See In re Int'l Sys. and Controls Corp. Sec. Litig.,* 693 F.2d 1235, 1240 (5th Cir.1982) (discovery of work product will be denied if information can be obtained by deposition).[5]

Having such an investigation conducted by a criminal defense firm after the disclosure of the problem supports the conclusion that the notes and eventual report were prepared in anticipation of further litigation. We need not distinguish whether it was criminal or further tenant litigation that caused the Report to arrive at the conclusion. Additionally, if we also weigh the fact that this law firm was retained to conduct this investigation **after** Plaintiffs herein began serving subpoenas on municipalities and Carousel's tenants, then, it is without question that the investigation and the Muse Report were done in furtherance of litigation or anticipated litigation. Therefore, the Court is prepared to declare as a general proposition that Defendants have made a prima facie showing that the Muse Report and all other underlying documents are, in fact, work product.[6] This determination does not, however, confer absolution from discovery. The Plaintiffs who seek production may prevail by demonstrating that an exception to the work product doctrine exists or that the privilege has been waived. To that end, the Plaintiffs have raised several exceptions and waivers to the privilege, and this Court will discuss each of them.

### D. Waiver

When discussing the issues of waiver and exception, both are applied simultaneously to the assertion of the attorney-client privilege and the work product doctrine equally. As we have already noted, within the Plaintiffs' Second Amended Complaint, they pled causes of action sounding in fraud and Civil RICO. Dkt. No. 185. As previously alluded, the document in question is relevant as to whether Defendants perpetrated fraud against Pyramid Mall's tenants by overcharging them on fees which have or could have irreparably damaged relationships with the tenants or could have been the mechanism for siphoning off money to the detriment of the Plaintiffs. Therefore, Plaintiffs seek these confidential documents under the crime or fraud exception to the attorney-client privilege and the work product doctrine. The courts have recognized such an exception to the attorney-client privilege and work product doctrine for communications between lawyers and clients that are designed to facilitate or even conceal the commission of a crime or fraud. *In re Richard Roe,* 68 F.3d 38, 39–40 (2d Cir.1995) (the issue is whether the communications were made to further that crime or fraud.); *In re John Doe, Inc.,* 13 F.3d 633, 636 (2d Cir. 1994); *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983,* 731 F.2d 1032, 1041 (2d Cir.1984); *In re John Doe Corp.,* 675 F.2d 482, 491 (2d Cir.1982); *United*

---

**5.** *See* discussion below.

**6.** Moselle's current attorneys have confirmed that neither Moselle nor they have any of the underlying data, interviews, files, records, and the like which support the findings within the Muse Report. Only the law firm of Stein, Mitchell & Mezines possess these items.

*States v. Bob,* 106 F.2d 37, 40 (2d Cir.1939). The Second Circuit, realizing the attorney-client privilege and work product immunity "substantially overlap," ruled that there was no need for a different standard for attorney work product. *In re Richard Roe,* 68 F.3d at 41, n. 2; *see also In re John Doe Corp.,* 675 F.2d at 492.

■ To assert this exception, the discovering party must demonstrate reasonable cause to believe that a crime or fraud has been committed or was intended and that the attorney-client communication was intended to facilitate or conceal the misconduct. *United States v. Jacobs,* 117 F.3d 82, 87 (2d Cir. 1997). That is, the particular communication or document in issue "itself" must be "**in furtherance** of a contemplated or ongoing criminal or fraudulent conduct." *In re Richard Roe,* 68 F.3d at 40 (emphasis added); *see also In re Richard Roe,* 168 F.3d 69, 71 (2d Cir.1999) (the document was intended in some way to facilitate or to conceal the criminal activity). Somehow or some way, the advice sought is used or contemplated to be used to complete an illegal activity or perpetrate a fraudulent scheme. *In re Int'l Sys. and Controls Corp. Sec. Litig.,* 693 F.2d 1235, 1242 (5th Cir.1982). In assessing whether the Plaintiffs have demonstrated probable cause, the Court may review, *in camera,* the privileged document and ascertain if it supports the view that it was being used at the time of its drafting to commit or conceal a fraud or a crime. *United States v. Zolin,* 491 U.S. 554, 572, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989); *Boss Mfg. Co. v. Hugo Boss AG,* 1999 WL 47324 (S.D.N.Y. Feb.1, 1999).

■ As directed, the Defendants have provided the Court with the Muse Report unredacted for an *in camera* review. *In re John Doe, Inc.,* 13 F.3d at 637 (court can use *in camera* review to look for crime or fraud). First, the Plaintiffs, notwithstanding the allegations within the Second Amended Complaint which they have reiterated throughout the pretrial litigation, including now, have not met their burden in establishing that this Report was or could in any way have been used to defraud anyone. *United States v. Zolin,* 491 U.S. at 570–72, 109 S.Ct. 2619 (a party seeking an *in camera* review of the

documents must make a threshold showing that such a review is appropriate). Without more, the allegations contained in a complaint cannot sustain a request to pierce the work production immunity. *In re Int'l Sys. and Controls Corp.,* 693 F.2d at 1242 (while the pleadings are unusually detailed, they are not enough). Still, the Court, with a very careful eye, suffering under the supposition that a fraud may be present, reviewed the Muse Report, and now declares that we were unable to detect even the hint that this Report was being used to further a crime or a fraud.

In fact, Plaintiffs know that the full content of this investigatory report concerns a past, possible malfeasance by someone within the Carousel Mall organization, and those revelations do not in any way suggest usage in furtherance of criminal conduct, notwithstanding the seriousness of their allegations against the Defendants. Nor could it possibly be used as such. To be blunt, Plaintiffs have the entire Report redacted only as to the name and gender of the alleged perpetrator. Impressions and theories of possible culpability are clearly revealed. Even the job title of the offending person is provided. All that is missing from Plaintiffs' redacted version is a name, which **may** help fill in the dots as to what occurred and possibly by whom, but under no stretch of the imagination does the Report qualify under the crime fraud exception or conceals a crime. Much to the contrary, the unredacted version of the Report now in Plaintiffs' possession reveals conduct which **could possibly** rise to the level of a crime. Plaintiffs have failed to demonstrate that this is proper justification for waiving the work product doctrine.

■ As noted above, the work product doctrine is not absolute. Such protection, like any other privilege, can be waived and the determination of such a waiver depends on the circumstances. *United States v. Nobles,* 422 U.S. at 239–40, 95 S.Ct. 2160. A voluntary disclosure of work product, for some or any inexplicable benefit, to a third party, especially if the party is an adversary, may waive the privilege. *In re Steinhardt Partners, L.P.,* 9 F.3d 230, 234–37 (2d Cir. 1993); *see also In re Grand Jury Proceed-*

*ings,* 219 F.3d 175, 191 (2d Cir.2000); *Strougo v. BEA Associates,* 199 F.R.D. 515, 521–22 (S.D.N.Y.2001). Once a party allows an adversary to share in an otherwise privileged document, the need for the privilege disappears, and may disappear forever, even as to different and subsequent litigators. *In re Steinhardt Partners,* 9 F.3d at 235 (citing *United States v. Nobles,* 422 U.S. at 239, 95 S.Ct. 2160). As illustration, when a party makes a strategic decision, no matter how broad and sweeping or limited, to disclose privilege information, a court can find an implied waiver. *In re Grand Jury Proceedings,* 219 F.3d at 190–92. Moreover, a party cannot partially disclose a privileged document nor selectively waive the privilege and then expect it to remain a shield. *Id.* at 191. However, there is no *per se* rule that all voluntary disclosures constitute a waiver of the work product doctrine because there is no way the court can anticipate all the situations when and how such disclosure is required. *In re Steinhardt Partners,* 9 F.3d at 236 (i.e., privilege not waived if shared with someone of common interest). There are times when a waiver can be broad and other times when it has to be narrowly construed. Each case must be judged on its own circumstances and merits. *See Strougo v. BEA Associates,* 199 F.R.D. at 521–22.

 Defendants made certain that all documents covering this issue, including the Muse Report itself, were not disclosed to Plaintiffs without the confidentiality protection attached. In addition to providing the Muse Report pursuant to the Confidentiality Order dated March 14, 2001 (Dkt. No. 55), Defendants required more insurance by having Plaintiffs sign a letter-memorandum dated July 25, 2003, acknowledging that the privilege has not been waived. Moselle also acknowledged that the Report was shared with others but has established, at least to this Court's satisfaction, that it was with parties with a common interest.

Slightly more troublesome for the Court are the newspaper interviews of Marc Malfitano and Robert Congel on the alleged problem with the Pilot Bills. Congel, particularly, acknowledged the problem, ultimate settlement of the problem, and that there was an investigation as to what occurred. During this lengthy interview, Congel was rather general on the facts, but he did not disclose the name of the alleged perpetrator. Based upon these revelations, is the Court required to deem them waived and thus provide the last bit of information from this Report, a name, to Plaintiffs? The Court thinks not.

Much like the court in *In re Grand Jury Proceedings,* 219 F.3d 175 (2d Cir.2000), we are guided by the principle of fairness. First, we do not see any prejudice being visited upon the Plaintiffs for not possessing the last vestige of undisclosed information, a name, which is being withheld from them. In this context, certainly, from the record provided, Plaintiffs have every and all information associated with this investigation but a name. In the same vein, the Court can confirm that the Report is not being used as both a shield and a sword.

The Court acknowledges that where a corporation or a significant representative or agent has voluntarily disseminated information to the public that reveals parts of privileged communication, this may cause a waiver. *Id.* at 184 (citations omitted). Such a strategic ploy, no matter the motive, may constitute a waiver. However, we should not lose sight that Congel was diligent and rather precise in not revealing all that he knew from this investigatory report and indeed there may have been a valid reason for such precision which this Court acknowledges. In applying its fairness principle, the Second Circuit has found, in certain situations, that " 'extrajudicial' disclosures of privileged information results only in waiver of the communications revealed, but not of related communications." *Id.* at 189 (citing *In re von Bulow,* 828 F.2d 94, 102–03 (2d Cir.1987)). Logically then, Congel could have possibly waived only as much of the Muse Report that could have informed and shaped his statements to the press.

Indeed, there must be some other motivation why Defendants have not revealed this name. Surely it would have been easier for them to have provided Plaintiffs with an unredacted version of the investigatory report under the cloak of the Confidentiality Order than to fight furiously not to disclose a name. It is evident that the Defendants did not want to disclose this name in which fraud or a crime is intimated in order to avoid further

litigation. To publicize to others that someone committed a crime by name, who has seriously contested the allegations, could possibly lead to a common law action for defamation and certainly this is a prudent reason not to disclose the name. Further, we would be remiss not to consider the recent explosion of litigation concerning employment matters, and that revelation of information like this surely would exacerbate the likelihood of litigation on this ground as well. There are some personal privacy matters within the context of employment that we cannot ignore and deserve some protection.[7] *See Spetalieri v. Kavanaugh,* 36 F.Supp.2d 92 (N.D.N.Y.1998). No matter the motivation, revealing this person's name will cause a significant firestorm and all efforts to avoid it are readily justifiable. The relevancy of this name is nominal at best. Therefore, this Court, employing its inherent discretionary powers to manage discovery, will tailor a specific remedy to address this matter. To the extent of Congel's revelation of the findings of the Muse Report, it will be disclosed. The underlying notes and such will not be disclosed. Under this analysis, the Muse Report, as redacted, meets this disclosure requirement. Rest assured that if the targeted person was one of the Defendants, our conclusion would be remarkably different.

If a party shows substantial need for the information and further establishes that they would suffer an undue hardship attempting to get this information or its substantial equivalent, the court may waive the work product doctrine. FED. R. CIV. P. 26(b)(3). We have found that the Muse Report does contain some relevant information to this instant case. But we must ask has the requesting party demonstrated they suffered an undue hardship in getting this information or its equivalent through other means. Plaintiffs represented they obtained specific records from the City of Syracuse and the audit papers from The Limited. Of the millions of documents already shared with Plaintiffs, they have gathered many other documents related to the Pilot Bill issue. Plaintiffs have explored the very subject matter of the work product doctrine through depositions. If it is the case that the Plaintiffs were able to get the information or facts through discovery and depositions, then their argument of undue hardship may be vitiated. *Atlantic Richfield Co. v. Current Controls, Inc.,* 1997 WL 538876, at *3 (W.D.N.Y. Aug.21, 1997). It should not be lost on us all by now that Plaintiffs have the entire Muse Report sans a name. With due respect, Plaintiffs have, in fact, obtained the substantial equivalent of whatever else can be revealed by this Report or the underlying work papers. Therefore, we conclude that Defendants have waived the Muse Report's attorney-client privilege or work product doctrine only to the extent of Congel's statements to the press.

Based upon all of the foregoing, Plaintiffs Motion to Compel disclosure of the Muse Report unredacted and the corresponding and supporting papers is DENIED. The Muse Report in redacted format is no longer protected by the attorney-client privilege or work product doctrine.

SO ORDERED.

---

7. The courts have spoken on disclosing privacy matters in the context of FOIA requests. The courts employed a balancing test between the public's right to know and the individual's interest in privacy and have thus recognized a privacy interest in information contained within an agency document that might lead to the identification of witnesses. *Grand Central P'ship, Inc., v. Andrew Cuomo,* 166 F.3d 473, 485 (2d Cir.1999) (citing *KTVY–TV v. United States,* 919 F.2d 1465, 1469 (10th Cir.1990) for the proposition that there is a privacy interest in names and "anything identifying interviewees to avoid harassment and embarrassment."). The sensitivity of any human being to disclosure of possible charges should be an appropriate subject of judicial notice. *Detroit Edison Co. v. Nat'l Labor Relations Bd.,* 440 U.S. 301, 318–19, 99 S.Ct. 1123, 59 L.Ed.2d 333 (1979). Although these courts are considering a statute that deals with records held by government, they are no less persuasive when balancing this Report with the Plaintiffs' right to know. As those courts have done, this Court would like to avoid any harassment, embarrassment, or unnecessary trampling of this employee's rights, especially when the allegations, as reflected in the Muse Report, are vigorously challenged by the employee. The Court is keenly aware of sensitivity of this matter and will balance it in favor of the employee since the utility of disclosure will have a nominal impact on this litigation.