Kevin TRUDEAU, an individual, Alliance Publishing Group, Inc., a Delaware corporation, and Shop America (USA) L.L.C., an Illinois limited liability corporation, Plaintiffs,

v.

NEW YORK STATE CONSUMER PROTECTION BOARD; Teresa A. Santiago, in her official and individual capacity; Caroline Quartarato, in her official and individual capacity, and Jon Sorensen, in his official and individual capacity, Defendants.

Civ. No. 1:05–CV–1019 (GLS/RFT).

United States District Court, N.D. New York.

July 21, 2006.

Jenner, Block Law Firm (Andrew A. Jacobson, Esq., Daniel J. Hurtado, Esq., David J. Bradford, Esq., of counsel), Chicago, IL, Jenner, Block Law Firm (Daniel Mach, Esq., of counsel), Washington, D.C., McNamee, Lochner Law Firm (Kevin Laurilliard, Esq., William A. Hurst, Esq., of counsel), Hiscock, Barclay Law Firm (Michael J. Grygiel, Esq., of counsel), Albany, NY, Winston, Strawn Law Firm (Lori J. Van Auken, Esq., of counsel), New York, NY, for Plaintiffs.

Hon. Eliot Spitzer, Attorney General for the State of New York (Roger W. Kinsey, Esq., Bridget Erin Holohan, Esq., James B. McGowan, Esq., Assistant Attorney Generals, of counsel), Albany, NY, for Defendants.

## MEMORANDUM–DECISION and ORDER

TREECE, United States Magistrate Judge.

Presently before this Court is a series of Letter–Motions and Letter–Briefs pertaining to a host of discovery conflicts, with the most contentious issue being whether Defendants' disclosure of privileged documents was either inadvertent, intended, or due to carelessness.[1] Before we address each of these discovery disagreements, the disputes must be put into context, therefore, a brief recitation of the facts in this case is warranted.

On August 11, 2005, a Complaint was filed in this matter based upon the allegation that

---

1. Because of the sensitive and confidential nature of some of the documents to be discussed herein, by a series of Text Orders, the Court granted the parties permission to submit their respective Letter–Motions and Letter–Briefs in traditional format for an *in camera* review. Text Orders, dated Mar. 29, 2006 & Apr. 14, 2006. We further advised the parties that after our review of the documents' content some of them may not remain under seal, which said public release may be a part of this Order. Text Order, dated Mar. 29, 2006.

It should be noted that subsequent Letter–Briefs were not filed under seal in the traditional format. *See* Dkt. Nos. 88, State Defs.' Lt.-Brief, dated Jun. 16, 2006 & 91, Pls.' Lt.-Brief, dated June 23, 2006.

the New York State Consumer Protection Board ("CPB") threatened to contact certain television stations in regards to Plaintiff Trudeau's book entitled "Natural Cures 'They' Don't Want You to Know About." The nature of the cause of action pled at that time was that CPB violated Plaintiffs' First Amendment Rights. Dkt. No. 1, Compl. at ¶¶ 3 & 6–9. That same day, in conjunction with the filing of the Complaint, a Motion for a Temporary Restraining Order ("TRO") was filed by Plaintiffs. Dkt. No. 2, TRO. Because of Plaintiffs' failure to comply with the Federal Rules of Civil Procedure and the Local Rules for the Northern District of New York, the application for a TRO was denied without prejudice. *See* Text Order, dated Aug. 15, 2005. Then, on August 16, 2005, an Emergency Motion for TRO was filed (Dkt. No. 6), which was opposed by Defendants (Dkt. Nos. 13–14). Prior to the Hearing, which was held on August 30, 2005, Defendants were told by the Honorable Gary L. Sharpe, United States District Judge, to "refrain from contacting broadcasting stations regarding plaintiffs' subject advertisement and maintain the status quo until the hearing." Deadlines for Mot., dated Aug. 17, 2005. At the August 30th Hearing, Judge Sharpe denied the Motion for TRO. Dkt. No. 15, Oral Order, dated Aug. 30, 2005.

On August 31, 2005, Plaintiffs filed a Motion for Preliminary Injunction and another Motion for TRO. Dkt. No. 17. That same day, after much re-consideration, Plaintiffs' Application for the TRO was granted as follows:

(1) The defendants are hereby enjoined from directly contacting any cable or broadcast station in order to induce such station to refuse to carry, or cease to carry, plaintiffs' advertisements for the Natural Cures book authored by Kevin Trudeau; and (2) The defendants are hereby enjoined from publishing or disseminating the letter attached as Exhibit A to the TRO application, or any letter substantially similar in content, as a means of indirectly contacting cable or broadcast stations (see "Dear cable station/broadcast station,"); *however,* (3) Nothing in the language of this TRO shall operate to preclude defendants from communicating with the public concerning the views expressed by the State Consumer Protection Board[.]

Dkt. No. 20, Order, dated Aug. 31, 2005, at pp. 2–3.

The Hearing for the Application for a Preliminary Injunction was scheduled for September 6, 2005. *Id.* at p. 3. On September 1, 2005, Defendants filed a Cross Motion to Dismiss and Opposition to the Motion for Preliminary Injunction. Dkt. No. 25. On September 5, 2005, Plaintiffs filed an Emergency Motion for TRO to *Restore the Status Quo.* Dkt. No. 37. At the September 6th Hearing, Judge Sharpe granted Plaintiffs' Motion for a Preliminary Injunction consistent with the language in the initial order and denied the Defendants' Cross Motion to Dismiss. Oral Order, dated Sept. 6, 2005; *see also* Dkt. No. 42, Minute Entry, dated Sept. 6, 2005. The Hearing for the Emergency Motion for TRO to *Restore the Status Quo* was scheduled for September 27, 2005, and on that date, Judge Sharpe denied Plaintiffs' Application. Dkt. No. 58, Minute Entry, dated Sept. 27, 2005.

On October 5, 2005, Plaintiffs filed their Motion for Leave to Amend and Supplement their Complaint (Dkt. Nos. 59, 62, 67 & 68), which was likewise opposed by Defendants (Dkt. Nos. 61, 70 & 71). By a Memorandum–Decision and Order, dated May 4, 2006, this Court granted in part and denied in part Plaintiffs' Motion. Dkt. No. 83. Nonetheless, Plaintiffs were permitted to file an Amended and Supplemented Complaint as follows to add: (1) another Plaintiff, Shop America (USA) L.L.C.; (2) another Defendant, Caroline Quartararo, Deputy Executive Director of the Consumer Protection Board ("CPB"); (3) claims for monetary damages against Teresa Santiago, Caroline Quartararo, and John Sorensen in their individual capacities for acts undertaken in their official capacities; (4) state law defamation claims against Santiago, Sorensen, and Quartararo; (5) claims for tortious interference against Santiago; and (6) a supplemental violation of Plaintiffs' First Amendment Right.[2] On

---

**2.** The May 4, 2006 Memorandum–Decision and Order was affirmed by Judge Sharpe. Dkt. No.

June 2, 2006, an Amended Complaint was served and filed. Dkt. No. 87.

## I. DISCUSSION

### A. Discovery as to Damages

Originally, when this action was first commenced, Plaintiffs only sought a declaratory judgment and a preliminary injunction. Dkt. No. 1, Compl. Now, with the advent of the Amended Complaint, Plaintiffs seek compensatory and punitive damages, on both the federal and state cause of actions, as to all of the Defendants. Dkt. No. 87, Am. Compl. There is no equivocation in the Plaintiffs' prayer for relief on behalf of Plaintiff Trudeau, as well as the other Plaintiffs, that they are seeking compensatory and punitive damages for being defamed and having their business relationships tortiously interfered with by Defendants. Id. at pp. 32–33 (see specifically, inter alia, ¶¶ (i), (l), (n)). Preliminarily, the projected damages are $2,000,000, but may rise to $20,000,000. CPB's Lt.-Brief, dated Mar. 29, 2006.

Defendants made a request for Production of Documents from all of the Plaintiffs seeking all documents "upon which [they will] rely upon to calculate the economic loss." Id. at p. 1. In response thereto, Plaintiffs provided Shop America's general ledger, Alliance Publishing's balance sheet, and a document from non-party Mercury Medial relating to historical book sales. Pls.' Lt.-Brief, dated Apr. 17, 2006, at pp. 1–2; Dkt. No. 91, Pls.' Lt.-Brief, dated Jun. 23, 2006, at p. 1 (listing the documents presented to Defendants). Notwithstanding these disclosures,

94, Order, dated July 19, 2006.

**3.** In a recent and brief telephone conference, this Court recalls Plaintiffs stating that they have provided all of the Shop America and Publishing Alliance financial records in their possession at this time, and are relying upon information to be gathered from the non-party Mercury Media to calculate their respective lost profits. With the assistance of an expert, Plaintiffs proffers that they may be able to identify more accurately the lost profits. Since Plaintiffs are representing that they have disclosed all that they have in their possession, it is our understanding the Defendants will await further disclosure, which they may attempt to gather directly from Mercury Media.

CPB finds the disclosures wholly inadequate. In terms of discovering information on economic damages, Defendants further seek Trudeau's tax returns and information regarding another lawsuit.

Plaintiffs seem to rely upon two basic arguments to limit the scope of disclosure, at least at this juncture, which seem in conflict with the broad claim for compensatory and punitive damages as to all Plaintiffs. First, Plaintiffs state in their Letter–Brief that the nature of the loss in this case is the lost profits as a result of CPB having wrongfully caused a number of TV and cable stations (possibly ten) to terminate the infomercials at issue in this litigation, and second, calculating the damages will require expert consultations, which has not yet occurred. Dkt. No. 91 at pp. 2 & 3 ("[T]he only economic damages at issue so far in this case are the projected lost profits resulting from lost book sales."); see also CPB's Lt.-Brief, Attach. 1 (schedule showing average weekly income and projected lost income as of Dec. 9, 2005, of 10 radio stations). Both prongs of this argument may have some validity as to Shop America and Publishing Alliance, however, such blanket objections appear to be inapplicable to Trudeau who is seeking possibly $20,000,000 in damages as to the defamation cause of action. CPB claims that Plaintiffs have failed to provide any shred of discovery demonstrating economic harm or damage as to Trudeau. Nonetheless, the sole damage discovery issue we will address in this Memorandum–Decision and Order will be Trudeau's tax returns and information related to the lawsuit *Trudeau v. Jordan Whitney*.[3]

In this context, which was initially a part of this critical debate for disclosure, the issue was whether Plaintiffs could be compelled to direct non-party Mercury Media to disclose further information to support their tabulation of lost profits. Again, based upon the brief telephone conference, Defendants will retreat from demanding this information now from Plaintiffs since they will be deposing Mercury Media. It is expected that Mercury Media will produce all of the relevant data at its deposition. However, Defendants reserved their right to renew their request for this information after evaluating the disclosures to be rendered by Mercury Media. Hence, these two disclosure issues will not be covered by this Memorandum–Decision and Order.

Similarly, Defendants had demanded copies of 900 studies Trudeau purportedly consulted or

### 1. Discovery of Tax Returns

▆▆▆ Routine discovery of tax returns is not the rule but rather the exception. *Sec. Exch. Comm'n (S.E.C.) v. Cymaticolor Corp.*, 106 F.R.D. 545, 547 (S.D.N.Y.1985) (finding that courts are reluctant to direct such disclosures). For nearly the past thirty-five years, tax returns have been considered "confidential," pursuant to 26 U.S.C. § 6103. *Gates v. Wilkinson*, 2005 WL 758793, at *1 (N.D.N.Y. Apr.5, 2005). Moreover, courts within the Second Circuit have found personal financial information to be presumptively confidential or cloaked with a qualified immunity. *Dew v. 39th Street Realty*, 2001 WL 388053, at *2 (S.D.N.Y. Apr.16, 2001) ("[T]here is a qualified immunity with respect to the disclosure of tax returns[.]"); *McMenamin v. Kingson*, 1999 WL 47199, at *3 (S.D.N.Y. Feb.2, 1999) (presumptively confidential); *see also Moustakis v. City of New York*, 1996 WL 517689, at *1 (S.D.N.Y. Sept.11, 1996) (concluding that even though tax returns are not privileged, as a "matter of policy," courts "should be cautious in ordering their disclosure"). Thus, courts grappling with whether personal tax returns and personal financial information should be disclosed must balance the countervailing policies of liberal discovery set forth in the Federal Rules of Civil Procedure against maintaining the confidentiality of such documents. *United States v. Bonanno Organized Crime Family of La Cosa Nostra*, 119 F.R.D. 625, 627 (E.D.N.Y.1988); *see also S.E.C. v. Cymaticolor Corp.*, 106 F.R.D. at 547.

▆▆▆ The Courts within the Second Circuit have fashioned a reasonable standard to be employed before directing the release of tax information. *Gates v. Wilkinson*, 2005 WL 758793, at *1 (finding that the standard should be "more stringent" than the relevancy standard found in FED.R.CIV.P. 26(b)(1)). This standard has a two pronged test: (1) the court must find that the requested tax information is relevant to the subject matter of the action; and (2) that there is a compelling need for this information because the information contained therein is not otherwise readily obtainable. *Id.; E.E.O.C. v. First Wireless Group, Inc.*, 225 F.R.D. 404, 406 (E.D.N.Y.2004); *Hamm v. Potamkin*, 1999 WL 249721, at *2 (S.D.N.Y. Apr.28, 1999); *Hazeldine v. Beverage Media, Ltd.*, 1997 WL 362229, at *4 (S.D.N.Y. June 25, 1997); *Moustakis v. City of New York*, 1996 WL 517689, at *1; *Gumowitz v. First Fed. Sav. & Loan Ass'n of Roanoke*, 160 F.R.D. 462, 463 (S.D.N.Y.1995) (citing *S.E.C. v. Cymaticolor Corp.*, 106 F.R.D. at 547); *Russell v. Del Vecchio*, 764 F.Supp. 275, 276 (E.D.N.Y.1991); *United States v. Bonanno*, 119 F.R.D. at 627. The showing of a compelling need for the information within the tax returns falls upon the party making the demand for this form of disclosure. *Laurin v. Pokoik*, 2004 WL 2724767 (S.D.N.Y. Nov.30, 2004); *United States v. Bonanno*, 119 F.R.D. at 627 (the burden of establishing relevance falls upon the party seeking the tax return). But once a compelling need has been shown, there is no justifiable reason to deny this pretrial financial discovery. *Hamm v. Potamkin*, 1999 WL 249721, at *2 (citing *Hazeldine v. Beverage Media*, 1997 WL 362229, at *3 (noting that "allowing pre-trial discovery avoids the inefficiency of a discovery delay")); *Tillery v. Lynn*, 607 F.Supp. 399, 402–03 (S.D.N.Y.1985).

▆▆▆ Nonetheless, the party whose tax returns may be the subject of a demand to disclose, especially when the demanding party may have made the requisite showing, has the burden in this discourse to provide alternative sources for this sensitive information. *Bujnicki v. Am. Paving & Excavating, Inc.*, 2004 WL 1071736, at *14 (W.D.N.Y. Feb.25, 2004) (cited in *Gates v. Wilkinson*, 2005 WL 758793, at *2); *Patrick Carter Assoc., Inc. v. Rent Stabilization Assn. of N.Y.C., Inc.*, 1992 WL 167387, at *2 (S.D.N.Y. Jun.26, 1992). Conversely, if the information contained in the tax return is otherwise available from other less intrusive sources, compelled discovery of the return should be denied. *Gates v. Wilkinson*, 2005 WL 758793, at *2. Garnering this financial information by a deposi-

---

reviewed in writing his book, to which Plaintiffs strenuously object. It is the Court's understanding that the parties have entered into a compro-

mise on this Demand in that Plaintiffs have agreed to provide a list of these 900 studies, which is acceptable to Defendants.

tion is one alternative source. *Id.* (citing, *inter alia, Hazeldine v. Beverage Media,* 1997 WL 362229, at *4). Another approach would have the party disclose relevant financial information by providing an affidavit of net worth, wealth, and income. *Hamm v. Potamkin,* 1999 WL 249721, at *2–3 (finding that the tax return provides the most reliable source of relevant financial information, but the substitution of a sworn net worth statement and income may suffice).[4]

■ In terms of the facts of our case, the financial information contained within the tax return is relevant to the respective claims made by Trudeau. Contrary to the Plaintiffs' position, a quest for a sizable award for compensatory damages premised upon any of the claims set forth within the Amended Complaint, particularly the cause of action sounding in defamation, makes Trudeau's financial circumstances relevant, and the Defendants should not have to wait until expert disclosure to find out how his losses will be calculated. There should be some pretrial financial information disclosure prior to the final stage of discovery, that is, expert disclosure. *See* Dkt. No. 66, Uniform Pretrial Scheduling Order, dated Nov. 30, 2005. Apparently, Defendants attempted to gain some of this information by a deposition but to little avail. Dkt. No. 88 at p. 1. Still, there remains less intrusive sources not yet denied to Defendants upon which we should be able to refer to before we pour over sensitive tax information.[5] The second prong of the standard, requiring a showing of compelling need for the financial information **within** the tax return, has not been met, at least not yet. Therefore, Plaintiff Trudeau shall be required to provide to the Defendants a net

worth statement, listing assets and liabilities, and gross and net income for the years 2003 to 2005. *Hamm v. Potamkin,* 1999 WL 249721, at *2–3; *Hazeldine v. Beverage Media,* 1997 WL 362229, at *4.

Initially, our visceral reaction would be to agree with Trudeau that his charitable contribution to a foundation set up by his accountant is not relevant and hence not subject to discovery. Yet, we realize that the Defendants may be faced with the stark reality that Trudeau could divert his revenue sources, such as the Natural Cures Book's profits, directly to the foundation without possibly reporting the earning of such income on his tax return or reflecting such data on his net worth statement, thereby being able to indicate a greater financial loss by the alleged actions of the Defendants.[6] Nonetheless, all other information regarding the foundation would be irrelevant. In order to prevent any concealment of Trudeau's revenue streams, we direct that, at a minimum, Trudeau disclose the extent of his contribution to this foundation and the nature of its primary source. If Trudeau does not make any contributions to this foundation, he will be required to so advise Defendants.

Defendants are not prejudiced in that they may renew their application for the tax returns if these disclosures provide scant and inadequate foundation for the calculation of losses.

### 2. Discovery of Documents Related to Another, Independent Litigation

■ On the heels of this litigation, Trudeau has initiated a separate lawsuit against Jordan Whitney in a California state court.

---

4. It is this Court's view that the substitution of a net worth statement is reasonable for both compensatory and punitive damages disclosure.

5. The Honorable David R. Homer, United States Magistrate Judge, cogently noted that there is other significant personal and sensitive information disclosed in a tax return, which may not be relevant to the financial information being sought. For example, Judge Homer identifies the social security numbers of the taxpayers, medical and other deductions, and spousal financial information, *inter alia,* which may not be relevant to the litigation. *Gates v. Wilkinson,* 2005 WL 758793, at *8, n. 3.

6. The relevant colloquy on the foundation, in part, reads as follows:

Q: Mr. Trudeau, you've made the statement, I believe, that you're going to give away your fortune?
A: ... Oh, I made that statement, yes.
Q: And what's the funding level for that?
A: Don't know the answer.
Q: Who would know the answer?
A: Probably my accountant ... [Mark Lane.].
Dkt. No. 91, Attach. Trudeau's Dep.

It appears that Jordan Whitney periodically publishes rankings on infomercials, which helps in gauging the success of a product or infomercial producer. It further appears that Trudeau claims that Jordan Whitney has misrepresented the success of the Natural Cures infomercial, which has damaged "Trudeau's reputation," and seeks $20,000,000 in damages. Under these circumstances, Defendants believe that they are entitled to inquire into whether Plaintiffs have been damaged by them or by the actions of a non-party, Jordan Whitney. Defs.' Lt.-Brief, dated Mar. 29, 2006, at p. 3. Plaintiffs' elementary retort to this request for information is that "the damages Trudeau seeks in that case—lost business opportunities to appear in and produce infomercials for third parties—are completely distinct from the economic damages sought in this case, namely lost book sales." Pls.' Lt.-Brief, dated Apr. 12, 2006, at p. 4.

Even without the benefit of reviewing the Jordan Whitney pleadings, evidently, the request for this information is more than "tangentially" relevant to this case as suggested by Plaintiffs. In this instant case, much like the action against Jordan Whitney, Trudeau is seeking damages for a besmirched reputation albeit by a different cause of action. Here, it is defamation. In the California case, Trudeau seeks damages primarily "for lost business opportunities," but we are confident that damages will be for much more than that, and in our litigation, he seeks broad compensatory and punitive damages for harm to his good name, which will include economic loss from lost book sales. Most telling in terms of the nature of the California lawsuit is Plaintiffs' press release on that lawsuit: "Trudeau alleges in the lawsuit that such **false** listing have [sic] skewed the public's and sales industry's **perception** of Trudeau's infomercial that promotes his book.... Having infomercial information and rankings accurately reported to the public **is essential to understanding how a product or in my case, a book, is actually received by the public.**" Defs.' Lt.-Brief, Mar. 29, 2006, Attach. 1 (news release) (emphasis added). Remarkably, in a material respect, both lawsuits deal with the public's perception of the Natural Cures Book, and it is not lost on

this Court that the infomercial is only one vehicle to promote the book. Rather than being distinct, damages in both seem to collide, if not merge, because the lost revenues on the sale of the book will be the *sine qua non* of both cases.

Moreover, Plaintiffs have not committed themselves to restrict or limit their damages in either case to the finite and compartmentalized economic losses suggested by them above, nor would we expect them to do so. Moreover, since presumably the relevant time frame for each of these lawsuits overlap, there is a possibility for a double recovery and the regrettable situation of one defendant being blamed for damages caused essentially by another. Under these circumstances, Defendants' request for information about the California State lawsuit, particularly as to the calculation of damages, is germane to the subject matter of this case. We also find that any fear that the California State case will unnecessarily accelerate in any manner, as suggested by Plaintiffs, is untenable. Weighing the liberality of the federal discovery rules, supported by our opinion that the Defendants' discovery request is calculated to lead to admissible evidence, Plaintiffs are directed to provide those documents related to this request, including calculations of damages, to the Defendants.

### B. Attorney–Client Privilege and Work Product Doctrine

Both parties have presented a number of interlocking issues on whether documents now in the possession of the Plaintiffs are indeed Defendants' privileged documents, and if found to be such, whether the manner in which Plaintiffs received those documents constitutes a waiver of any privilege that may have attached. Pursuant to the Court's directions, the documents in questions were attached to Plaintiffs' Letter–Brief, dated April 12, 2006, which was submitted *in camera*. *In re John Doe Corp.*, 675 F.2d 482, 489–90 (2d Cir.1982) (finding that *in camera* submission provides a method of judicial resolution without revealing confidential information). However, the scope of our review has been limited. The Court conducted a telephone conference in June 2006 with the

parties wherein the Court was informed that only three documents are now at the heart of this controversy. We will commence our discussion with an analysis of the various principles of law and then we will review the facts and circumstances that implicate these legal principles.

### 1. Privilege Log

The first issue for us to address is the adequacy of the Defendants' Privilege Logs. Both parties submitted as an attachment to their respective Letter–Brief samples of the Defendants' Privilege Logs, which were presented to the Plaintiffs. Plaintiffs stake the position that these Logs fail to comport with statutory requirements and because of the inadequacy of the Logs this Court should deem all of the documents listed therein waived for all purposes. Controverting Plaintiffs' position, Defendants defend the adequacy of the Logs, however, if the adequacy of the Logs is found to be unsatisfactory, Defendants argue vociferously that such a drastic remedy of deeming all of the documents listed in the Logs as waived is unwarranted. At least, in terms of the adequacy of the Logs, we agree with the Plaintiffs' assessment.

■ A proponent of a privilege log must "make the claim expressly and shall describe the nature of the documents, communications, or things not produced or disclosed in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the applicability of the privilege or protection." FED.R.CIV.P. 26(b)(5).[7] In this respect, and in order to evaluate and facilitate the determination of whether a privilege exists, courts generally require compliance with this statutory mandate that an adequately detailed privilege log be provided. *United States v. Constr. Prod. Research, Inc.*, 73 F.3d 464, 473 (2d Cir.1996) (citations omitted). Without an adequately detailed privilege log, the courts are hamstrung in attempting to decipher the presence and the extent of the claimed privilege.

To constitute an acceptable privilege log, at a minimum, it should provide facts that would establish each element of the claimed privilege as to each document, *Strougo v. BEA Assoc.*, 199 F.R.D. 515, 519 (S.D.N.Y.2001), and "identify each document and the individuals who were parties to the communications, providing sufficient detail to permit a judgment as to whether the document is at least potentially protected from disclosure. Other required information, such as the relationship between individuals not normally within the privileged relationship, is then typically supplied by affidavit or deposition testimony." *United States v. Constr. Prod. Research, Inc.*, 73 F.3d at 473. When a party fails to comply with the requirements of Rule 26(b)(5) when submitting a privilege log, which is inadequate as a matter of law in that the log just does not provide sufficient information to support the privilege, the claim of privilege may be denied. *Johnson v. Bryco Arms*, 2005 WL 469612, at *3–4 (E.D.N.Y. Mar.1, 2005) (citing *United States v. Constr. Prod. Research, Inc.*, 73 F.3d at 474).

Here, the Defendants' Privilege Logs are woefully inadequate and the "dearth of information [within the Logs] is so [in]complete that the listing[s] [therein are] the functional equivalent of no listing at all." *A.I.A. Holdings, S.A. v. Lehman Bros., Inc.*, 2000 WL 1538003, at *3 (S.D.N.Y. Oct.17, 2000). The Privilege Logs' deficiencies are glaring inasmuch as

- there are no descriptions as to the identities of the sender and recipient of the documents;
- the date sent or received is not evidently clear;
- the descriptions of the claimed privilege documents are much too meager or cursory to adequately identify the document; and
- the type of privilege being asserted is not identified at all, rendering it an ordeal to recognize that indeed the described documents is or should be cloaked with a privilege.

---

7. Defendants contend that it is the Plaintiffs and not them who should have the burden of going forward to identify the apparent deficiencies in the Logs. Defendants' contention is misplaced.

Since the Defendant are asserting the privilege, it remains always the Defendants' burden to provide the necessary information to support their assertion. *See also infra* Part. II.B.2.

*United States v. Constr. Prod. Research Inc.,* 73 F.3d at 474; *Strougo v. BEA Assoc.,* 199 F.R.D. at 519.

 Considering the deficiencies of Defendants' Privilege Logs, the Plaintiffs are correct that the Court could declare all of the purported privileges waived. And, yet, adjudging these documents as waived would be too austere a remedy when the deficiencies can be readily rectified at this juncture of the litigation. *Export–Import Bank of United States v. Asia Pulp & Paper Co., Ltd.,* 232 F.R.D. 103, 111 (S.D.N.Y.2005) (although finding the privilege log inadequate, the court directed that a new privilege log be promulgated). Furthermore, the Court is able to decode enough information from the Logs, when supplemented by the Defendants' submissions in support of the privilege, to appreciate, at least, the disputation on the privilege. Hence, the Court will not adopt the Plaintiffs' importune to waive *carte blanche* the privileges due to Defendants' failure to comply with the Federal Rules. If any waivers are applicable, it will be determined on the merits, document by document, and not completely on the failure to provide sufficient information within the Logs.

Therefore, the Court will require the Defendants to submit new, more descriptive logs to Plaintiffs containing the following information: (1) the identity of each person listed as author and their role in preparing the documents; (2) the identity of each recipient, the role in which they received the documents and whether they are a party or non-party; (3) a more elaborate description of the specific document, or specific portion of the document, which is claimed to be protected by any privilege, without revealing the substance of the privileged communication; (4) identify any bate stamp number or any other identifiable notation; and, (5) identify the type of privilege being asserted (i.e., attorney-client privilege, work product, deliberative process, executive privilege).

### 2. *Attorney–Client Privilege*

The attorney-client privilege is a longstanding, common law privilege recognized in New York and by the federal courts under FED.R.EVID. 501. It is one of those "bedrock

principle[s] of our justice system [which has been sustained] for hundred[s] of years," dating back to the 1600s. *See* AM. LAW INST.—ABA—ATTORNEY—CLIENT PRIVILEGE(May 15, 2005) at p. 87; *United States v. Bilzerian,* 926 F.2d 1285, 1292 (2d Cir.1991) (citing 8 J. WIGMORE, EVIDENCE, at § 2290, at pp. 542–44 (McNaughton rev.1961) (the privilege being the oldest known—"[the] most ancient of confidential communication privileges")). This rule has been immortalized as a legal doctrine for eons to encourage full engagement between a party and her attorney so that full and frank communication exists to impart all the information an attorney may need in order to give sage and cogent advice on the matter. *Swidler Berlin v. United States,* 524 U.S. 399, 403, 118 S.Ct. 2081, 141 L.Ed.2d 379 (1998); *United States v. Schwimmer,* 892 F.2d 237, 243 (2d Cir.1989) ("[The] communications between attorney and client endures as the oldest rule of privilege known to the common law."). Stated another way, its essential purpose is to encourage clients to be fully forthcoming with their attorney and to receive, in return, advice which will protect the client's legal rights. *Upjohn Co. v. United States,* 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981); *Asian Vegetable Research & Dev. Ctr. v. Inst. of Int'l Educ.,* 1996 WL 14448, at *4 (S.D.N.Y. Jan.16, 1996) (citing, *inter alia, In re Horowitz,* 482 F.2d 72, 81 (2d Cir.), *cert. denied,* 414 U.S. 867, 94 S.Ct. 64, 38 L.Ed.2d 86 (1973)). The free-flow of information and the twin tributary of advice are the hallmarks of the privilege. For all of this to occur, there must be a zone of safety for each to participate without apprehension that such sensitive information and advice would be shared with others without their consent. *In re Grand Jury Subpoena Duces Tecum Dated November 16, 1974,* 406 F.Supp. 381, 386 (S.D.N.Y.1975) ("The sine qua non of the attorney-client-privilege is . . . a confidence reposed. . . .").

 When determining if there is in fact an attorney-client privilege present to cloak both the client's communication and the corresponding legal advice, a court needs to ascertain that this safety net attaches to only those communications (1) where legal advice

of any kind is sought, (2) from a professional legal advisor in his or her capacity as such, (3) the communication relates to that purpose, (4) made in confidence, (5) by the client, and (6) are at his or her insistence permanently protected, (7) from disclosure by the client or the legal advisor, (8) except if the protection is waived. *United States v. Int'l Bhd. of Teamsters*, 119 F.3d 210, 214 (2d Cir.1997) (citing *In re Grand Jury Subpoena Duces Tecum*, 731 F.2d 1032, 1036 (2d Cir. 1984)); *Madanes v. Madanes*, 199 F.R.D. 135, 143 (S.D.N.Y.2001) (citing, *inter alia, In re Richard Roe, Inc.*, 68 F.3d 38, 39–40 (2d Cir.1995) & quoting *United States v. Kovel*, 296 F.2d 918, 921 (2d Cir.1961)); *see also* 8 WIGMORE, EVIDENCE § 2292. This privilege, as previously stated, further attaches to the advice rendered by the attorney. *In re Six Grand Jury Witnesses*, 979 F.2d 939, 943–44 (2d Cir.1992). The burden of proving each element of the privilege rests on the party claiming the protection. *In re Horowitz*, 482 F.2d at 82.

Contrary to modern yet ill-informed perceptions, the attorney-client privilege is often "[n]arrowly defined, riddled with exceptions, and subject to continuing criticism." *United States v. Schwimmer*, 892 F.2d at 243. Grand as the privilege stands in our legal lexicon, it is nonetheless narrowly defined by both scholars and the courts. *Univ. of Pa. v. E.E.O.C.*, 493 U.S. 182, 189, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990).[8] The attorney-client privilege is not given broad, unfettered latitude to every communication with a lawyer, but is to be narrowly construed to meet this narrowest of missions. *Fisher v. United States*, 425 U.S. 391, 403, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976) ("However, since the privilege has the effect of withholding relevant information from the factfinder, it applies only where necessary to achieve its purpose."); *see also In re Horowitz*, 482 F.2d at

81 (privilege ought to be "strictly confined within the narrowest possible limits consistent with the logic of its principle") (quoting 8 WIGMORE § 2292 at 70); *United States v. Int'l Bhd. of Teamsters*, 119 F.3d at 214.

The case law generally assumes the existence of a governmental attorney-client privilege in civil suits between government agencies and private litigants. *In re Grand Jury Investigation*, 399 F.3d 527, 532–33 (2d Cir. 2005) (citing, *inter alia, In re Lindsey*, 158 F.3d 1263, 1268 (D.C.Cir.1998) ("Courts, commentators, and government lawyers have long recognized a government attorney-client privilege in several contexts.")). That is, the legal maxim is substantial in presuming that the "rationale supporting the attorney-client privilege applicabil[ity] to private entities has general relevance to governmental entities as well." *Id.* at 533 (ultimately finding that this rule has the same force in effect in criminal law as it does in civil cases).

### 3. Work Product Doctrine

 Whenever the attorney-client privilege is raised in on-going litigation, concomitantly the work product doctrine is virtually omnipresent. They are inseparable twin issues, and when one is advanced, surely the other will follow. The work product privilege is more broad than the attorney-client privilege. *In re Grand Jury Proceedings*, 219 F.3d 175, 190 (2d Cir.2000). This privilege exists to protect attorneys' mental impressions, opinions, and/or legal theories concerning litigation. *Horn & Hardart Co. v. Pillsbury Co.*, 888 F.2d 8, 12 (2d Cir.1989). Indeed, the work product privilege is designed to protect an adversarial system of justice and has been analyzed in that context by the Supreme Court in *Hickman v. Taylor*, 329 U.S. 495, 510–11, 67 S.Ct. 385, 91 L.Ed. 451 (1947). This doctrine establishes a "zone of privacy" in which a lawyer can prepare

---

8. There is the general maxim that the public, particularly within the judicial forum, is entitled to be exposed to "everyman's evidence." 8 WIGMORE, EVIDENCE § 2317 (McNaughton rev. ed.1961). The quest is for the truth of the matter to flow forward before the court, and "[t]he suppression of truth is a grievous necessity at best ... [only justified] when the opposed private interest is supreme." *In re Megan–Racine Assocs., Inc.*, 189 B.R. 562, 570 (Bankr.N.D.N.Y.

1995) (citing *McMann v. Sec. and Exch. Comm'n*, 87 F.2d 377, 378 (2d Cir.1937)). But since the attorney-client privilege "stands in derogation of the public's right to everyman's evidence, ... it ought to be strictly confined within the narrowest possible limits consistent with the logic of the principle." *In re Grand Jury Proceedings*, 219 F.3d 175, 182 (2d Cir.2000) (citing *United States v. Int'l Bhd. of Teamsters*, 119 F.3d 175, at 214).

and develop theories and strategies with an eye towards litigation free from unnecessary intrusion by his or her adversaries. *United States v. Adlman ("Adlman I")*, 68 F.3d 1495, 1500–01 (2d Cir.1995) (citing *United States v. Nobles*, 422 U.S. 225, 238, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975) & *Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451); *see also In re Minebea Co., Ltd.*, 143 F.R.D. 494, 499 (S.D.N.Y.1992). Of course the burden, albeit not a heavy one, of establishing that the work product doctrine applies rests with that party's attorney who is claiming the protection. The work product doctrine, as well as the attorney-client privilege, "does not extend to every document generated by the attorney; it does not shield from disclosure everything a lawyer does." *Rattner v. Netburn*, 1989 WL 223059, at *6 (S.D.N.Y. June 20, 1989). The doctrine is generally invoked as soon as the attorney, in responding to a request for production of documents, serves upon the requesting party a privilege log asserting this and any other relevant privilege or provides notification that it will not be disclosed for this reason. FED.R.CIV.P. 26(b)(5) & 34(b). Failure to timely provide the privilege log, as discussed above, or objection constitutes a waiver of any of the asserted privileges. Even if a party follows these steps, the security of the work product doctrine is not assured. There must be the omnipresent concern that revealing the attorney's mental processes is real and not just speculative. *Gould Inc. v. Mitsui Mining & Smelting Co., Ltd.*, 825 F.2d 676, 680 (2d Cir.1987).

FED.R.CIV.P. 26(b)(3) provides a relevant rule on the discovery of work product material. It reads in part:

[A] party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against the disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

▮▮▮▮ It is important to note that the work product doctrine classifies documents into two categories: "non-opinion" work product and "opinion" work product. The distinction between these two categories turns on the effort employed in obtaining disclosure pursuant to Rule 26(b)(3). For "non-opinion" work product, the party seeking this information must show a substantial need for the document and undue hardship to acquire the document or its substantial equivalent by other means. On the other hand, "opinion" work product requires a higher protection to the extent that the requesting party has to demonstrate extraordinary justification before the court will permit its release. *Strougo v. BEA Assocs.*, 199 F.R.D. 515, 521 (S.D.N.Y.2001) (citing *In re Sealed Case*, 676 F.2d 793, 809–10 (D.C.Cir. 1982)); *see also Upjohn Co. v. United States*, 449 U.S. at 401, 101 S.Ct. 677. At a minimum, such "opinion" work product should remain protected until and unless a highly persuasive showing is made. *In re Grand Jury Proceedings*, 219 F.3d at 191; *United States v. Adlman ("Adlman II")*, 134 F.3d 1194, 1204 (2d Cir.1998). In a similar vein, in most instances, the work product doctrine does not extend to facts. Generally, nonprivileged facts should be freely discoverable. *Compare In re Savitt/Adler Litig.*, 176 F.R.D. 44, 48 (N.D.N.Y.1997) *with In re Grand Jury Subpoena Dated Oct. 22, 2001*, 282 F.3d 156, 161 (2d Cir.2002).[9]

▮▮▮▮ "[W]here a party faces the choice of whether to engage in a particular course of conduct virtually certain to result in litiga-

---

9. We note however that the Plaintiffs do not advance the argument that there is a substantial hardship which would permit disclosure pursuant to the guidelines set forth in Rule 26(b)(3). This analysis may still become pertinent.

tion and prepares documents analyzing whether to engage in the conduct based on its assessment of the likely result of the anticipated litigation, [it should be] conclude[d] that the preparatory documents should receive protection under Rule 26(b)(3)." *Adlman II*, 134 F.3d at 1196. The crux being that a document which has been prepared because of the prospect of litigation will not lose its protection under the work product doctrine, even though it may assist in business decisions. *Adlman I*, 68 F.3d at 1502; *Strougo v. BEA Assocs.*, 199 F.R.D. at 521. But this protection will not be extended, under any circumstances, to records that are prepared in the ordinary course of business. *Adlman I*, 68 F.3d at 1502. Even though the work product doctrine protects the impressions, opinions, theories, and strategies of an attorney, Rule 26(b)(3) makes clear that the document at issue, either obtained or prepared by or for a party, or by or for his representative, may be cloaked by this doctrine as well. *Id.* This maxim makes sound sense considering how complex litigation can be and the undeniable need for others to assist in developing all that is necessary to prosecute or defend a lawsuit. Obviously, impressions and strategies are not always created in a vacuum, but, rather are generated in cogent discourse with others, including the clients and agents. Further, the exchange of such documents and ideas with those whose expertise and knowledge of certain facts can help the attorney in the assessment of any aspect of the litigation does not invoke a waiver of the doctrine. *United States v. Nobles*, 422 U.S. at 239, 95 S.Ct. 2160; *Adlman I*, 68 F.3d at 1502.

### 4. Waiver of Attorney–Client Privilege and Work Product Doctrine

There are circumstances, and permutations thereof, that cause waivers upon waivers to these less than sacrosanct rules. Cynthia B. Feagan, Comment, *Issues of Waiver In Multiple–Party Litigation: The Attorney–Client Privilege and the Work Product Doctrine*, 61 UMKC L. Rev. 757 (1993); Edna Selan Epstein, *The Attorney–Client Privilege and the Work–Product Doctrine*, (4th ed.2001). Considering that the attorney-client privilege protects communications and the work product doctrine protects tangible items which may contain strategies, impressions, and attorney's opinions, both the privilege and the doctrine may be waived in various ways including sharing such documents with a third party. *In re Pfohl Bros. Landfill Litig.*, 175 F.R.D. 13, 22–28 (W.D.N.Y.1997) (survey of the various types of implicit and explicit waivers); *see also* Feagan, Comment, *Issues of Waiver in Multiple–Party Litigation*, 61 UMKC L. Rev. at 775–77. We need not now address all of the potential waivers and exceptions to the attorney-client privilege and the work product doctrine, but it is necessary in the context of this case to first draw upon those waivers which invariably cause lawyers the greatest angst, and may be problematic in this case. *See In re Pfohl Bros. Landfill Litig.*, 175 F.R.D. 13.

#### a. Third Party Waiver

█ The waiver to which we speak is whether the client's communication(s) or the legal advice given was shared, in some form or fashion, with a third party. A waiver such as this may be done explicitly or implicitly, or rather, intentionally or inadvertently. 6 JAMES M. MOORE ET AL, MOORE'S FEDERAL PRACTICE § 26.49[5] (3d ed.2005); *In re Pfohl Bros. Landfill Litig.*, 175 F.R.D. at 24–26. Obviously, when communications between a party and her attorney occur in the presence of a third party, the privilege may be waived. *United States v. Am. Tel. and Tel. Co.*, 642 F.2d 1285, 1298–99 (D.C.Cir.1980). Yet, a disclosure to a third party does not waive the privilege unless such disclosure is inconsistent with the "maintenance of secrecy" and if the disclosure "substantially increases the possibility of an opposing party obtaining the information." *GAF Corp. v. Eastman Kodak Co.*, 85 F.R.D. 46, 51–52 (S.D.N.Y.1979). For example, an exemption from the waiver accrues if such communications are shared with an agent of the attorney, which may include investigators and accountants retained to assist the attorney in rendering legal advice and instruction. *United States v. Schwimmer*, 892 F.2d 237, 243 (2d Cir.1989) (accountant); *United States v. McPartlin*, 595

F.2d 1321, 1336–37 (7th Cir.1979) (investigator); *United States v. Kovel,* 296 F.2d 918, 921–24 (2d Cir.1961) (disclosures to an accountant does not waive attorney-client privilege).

As noted above, the work product doctrine is not absolute either. Such protection, like any other privilege, can be waived and the determination of such a waiver depends on the circumstances. *United States v. Nobles,* 422 U.S. at 239–40, 95 S.Ct. 2160. In fact, in most respects, the discussion of a third party waiver is virtually the same for both the attorney-client privilege and the work product doctrine. A voluntary disclosure of work product, for some or any inexplicable benefit, to a third party, especially if the party is an adversary, may waive the immunity. *In re Steinhardt Partners, L.P.,* 9 F.3d 230, 234–37 (2d Cir.1993); *see also In re Grand Jury Proceedings,* 219 F.3d at 191; *Strougo v. BEA Associates,* 199 F.R.D. at 521–22. Once a party allows an adversary to share in an otherwise privileged document, the need for the privilege disappears, and may disappear forever, even as to different and subsequent litigators. *In re Steinhardt Partners,* 9 F.3d at 235 (citing *United States v. Nobles,* 422 U.S. at 239, 95 S.Ct. 2160). As an illustration, when a party makes a strategic decision, no matter how broad and sweeping or limited, to disclose privileged information, a court can find an implied waiver. *In re Grand Jury Proceedings,* 219 F.3d at 190–92. Moreover, a party cannot partially disclose a privileged document nor selectively waive the privilege and then expect it to remain a shield. *Id.* at 191. However, there is no *per se* rule that all voluntary disclosures constitute a waiver of the work product doctrine because there is no way the court can anticipate all of the situations when and how such disclosure is required. *In re Steinhardt Partners,* 9 F.3d at 236 (*i.e.,* privilege not waived if shared with someone of common interest). There are times when a waiver can be broad and other times when it has to be narrowly construed. Each case must be judged on its own circumstances and merits. *See Strougo v. BEA Associates,* 199 F.R.D. at 521–22.

In the context of an inadvertent disclosure of a privileged document, as just stated, such oversight does not necessarily mean a privilege is waived unless "the producing party's conduct was so **careless** as to suggest that it was not concerned with the protection of the asserted privilege." *Atronic Int'l, GMBH v. SAI Semispecialists of Am., Inc.,* 232 F.R.D. 160, 163 (E.D.N.Y. 2005) (citation omitted). To emphasize this point, some courts within the Second Circuit have created a standard to evaluate the mishap disclosure:

> "[T]he Court must assess whether the procedure[s] followed in maintaining the confidentiality of the document[s] [were] . . . so lax, careless, inadequate or indifferent to consequences as to constitute a waiver." *Martin v. Valley National Bank of Arizona,* 1992 WL 196798, at *2 (S.D.N.Y. Aug.6, 1992). Inadvertent production will not waive the privilege unless the conduct of the producing party or its counsel evinced such extreme carelessness as to suggest that it was not concerned with the protection of the privilege. *See Lloyds Bank PLC v. Republic of Ecuador,* 1997 WL 96591, at *3 (S.D.N.Y. Mar.5, 1997) (quoting *Desai v. American Int'l Underwriters,* 1992 WL 110731, at *1 (S.D.N.Y. May 12, 1992)).

*United States Fid. & Guar. Co. v. Braspetro Oil Servs. Co.,* 2000 WL 744369, at *5 (S.D.N.Y. June 8, 2000) (internal quotations marks omitted) (alterations in original).

Although this rule sounds rather definitive on the law pertaining to disclosure and waiver, however, where a party makes an effort to demonstrate that such divulgence should not constitute a waiver, a flexible balancing test has been devised: (1) the reasonableness of the precautions taken by the producing party to prevent inadvertent disclosure of privileged documents; (2) the volume of discovery versus the extent of the specific disclosure issue; (3) the length of time taken by the producing party to rectify the disclosure; and (4) the overarching issue of fairness. *Atronic Int'l,* 232 F.R.D. at 164 (quoting *United States v. Rigas,* 281 F.Supp.2d 733, 738 (S.D.N.Y.2003)).

### b. At Issue Waiver

■ It is well settled law that in "certain circumstances a party's assertion of factual claims can, out of consideration of fairness to the party's adversary, result in the involuntary forfeiture of privileges for matters pertinent to the claims asserted." *John Doe Co. v. United States*, 350 F.3d 299, 302 (2d Cir. 2003) (citing, *inter alia, United States v. Bilzerian*, 926 F.2d 1285 (2d Cir.1991)). The application of "at issue" waiver is primarily due to the fact that the party asserting the privilege has placed "a contention at issue." *Id.* (citing, *inter alia, Worthington v. Endee*, 177 F.R.D. 113, 116–117 (N.D.N.Y.1998) and 6 JAMES WM. MOORE ET. AL, MOORE'S FEDERAL PRACTICE § 26.70[6][c] (3d ed.1997)).[10]

■ Forfeiture of the privilege turns on the consideration of fairness, or, more correctly cast, unfairness to the adversary. This unfairness to the adversary is *"having to defend* against a privilege holder's claim without access to pertinent privilege material that might refute the claim." *John Doe Co. v. United States*, 350 F.3d at 304 (emphasis in original). Thus, in the circumstances where a party contends facts to an "adjudicating authority" (a court, jury or decision maker) then relies upon the privilege "to deprive its adversary of access to [the] material that might disprove, [impeach], [effectively contest], [rebut] or undermine the party's contention," such would be unfair. *Id.* at 302 & 303; *In re von Bulow*, 828 F.2d 94, 102

(2d Cir.1987) (assertion during a judicial proceeding).[11] Or, where the privilege holder intends to visit prejudice upon his opponent or disclose only select portions of the privileged communication for "self serving purposes" in order to promote a claim in the litigation that in fairness may require examination of this protected communication, then the privilege may be forfeited. *United States v. Bilzerian*, 926 F.2d at 1292 & 1293 ("[For example, the court] cannot sanction the use of the privilege to prevent effective cross examination on matters reasonably related to those introduced in direct examination."). The Fairness Doctrine will not allow the privilege to stand when the proponents seek to use it for a purpose that is inconsistent with the privilege. What the court is attempting to avoid is the wielding of the attorney-client privilege and the work product doctrine as both a shield and a sword. *In re Grand Jury Proceedings*, 219 F.3d at 182; *United States v. Bilzerian*, 926 F.2d at 1292 (citing *In re von Bulow*, 828 F.2d at 103). It is the unfairness that is the crucible for the forfeiture. *John Doe Co. v. United States*, 350 F.3d at 306 (citing *In re von Bulow*, 828 F.2d at 102).

■ Resolving whether an "at issue" forfeiture has occurred may appear initially easy, but we know, from experience, that it can be a vexing exercise for a court. Nonetheless, the test that the courts within the

---

10. It is now an established principle of law that if the advice of counsel is placed in issue by either a claim, defense, or testimony it is deemed waived. *Rhone–Poulenc Rorer Inc. v. Home Indem. Co.*, 32 F.3d 851 (3d Cir.1994); *United States v. Bilzerian*, 926 F.2d 1285. Moreover, it is not the filing of the lawsuit that matters but the relevance of the contention that controls. *Remington Arms Co. v. Liberty Mut. Ins. Co.*, 142 F.R.D. 408 (D.Del.1992).

11. Often the scope of *In re von Bulow*, which is a seminal case on this issue, is overstated in terms of the breadth of "at issue" forfeiture. The case actually stands for a limited version of a waiver or forfeiture of the attorney-client privilege. von Bulow granted permission to his attorney to make certain disclosures in a book about his infamous criminal case. Many revelations and privileged discussions were publicly disclosed in this best selling book. It would appear then that these revelations would have forever waived the

attorney-client privilege in a subsequent civil lawsuit. However, the Second Circuit did not find these *extrajudicial disclosures* of the attorney-client communication to be a *carte blanche* waiver of the protection. Rather, the Second Circuit held that these extrajudicial disclosures, which were not used in a judicial proceeding and did not prejudice his adversary, did not constitute a waiver of the privilege as to the **undisclosed** portion of the attorney-client communications. *In re von Bulow*, 828 F.2d at 102. The extrajudicial disclosures of privileged information "results only in [a] waiver of the communication revealed, but not of related communications." *In re Grand Jury Proceedings*, 219 F.3d at 189 (citing *In re von Bulow*, 828 F.2d at 102–03). The *von Bulow* Court went on to say that had this been a "subject matter waiver" the results would have been much different and the reach of the waiver may have touched on all privileged conversations. *In re von Bulow*, 828 F.2d at 102–03.

Second Circuit have resorted to in order to facilitate this nettling analysis is:

> (1) assertion of the privilege was a result of some affirmative act, such as filing suit, (2) through the affirmative act, the asserting party puts the protected information at issue by making it relevant to the case, and (3) the application of the privilege would have denied the opposing party access to information vital to the defense.

*Bank Brussels Lambert v. Credit Lyonnais (Suisse)*, 1995 WL 598971, at *3 (S.D.N.Y. Oct.11, 1995) (citing *Hearn v. Rhay*, 68 F.R.D. 574, 581 (E.D.Wash.1975)).[12]

■ Because of the fragility of broad generalizations and sometimes *per se* rules, in the context of determining fairness, it is more prudent to decide the at issue waiver on a case by case basis, which "depends primarily on the specific context in which the privilege is asserted" or on its own particular facts. *John Doe Co. v. United States*, 350 F.3d at 302 & 305 (citing *In re Grand Jury Proceedings*, 219 F.3d at 183). The forfeiture should be narrowly construed and tailored to remedy the unfairness or prejudice. *In re Grand Jury Proceedings*, 219 F.3d at 188. It is further axiomatic, when a number of documents are claimed to be privileged, that there is no wholesale waiver but rather a specific inquiry as to each document.

### C. Document Review

As mentioned above, our review is limited to three documents: 1) Cable Operator Draft; 2) Jon Sorenson's Email, dated September 7, 2005; and 3) August 30, 2005 Letter. Plaintiffs cast a general pall over the claim of privilege by asserting that such is waived because of the careless nature in which the documents were disclosed to them. Additionally, in regard to the "cable operator" draft letter and Sorenson's email, dated September 7, 2005, Plaintiffs contend that such document presents an at issue waiver.

Defendants cannot find any comfort relying upon the blanket statement set forth in their response to the Plaintiffs' Demand to Produce that "they expressly reserve all privileges, including attorney-client privilege and work-product rule." Such broadly constructed instruction is of debatable value and flies in the face of the mandate set forth in Rule 26(b)(5) that "the party [asserting the privilege] shall make the claim expressly and shall describe the nature of the documents...." This Rule requires a specific, denoted objection to a specific document and not a comprehensive, imprecise command. Furthermore, "[s]uch pat, generic, non-specific objections, intoning the same boilerplate language are inconsistent with both the letter and the spirit of the Federal Rules of Civil Procedure." *King–Hardy v. Bloomfield Bd. of Educ.*, 2002 WL 32506294, at *4 (D.Conn. Dec.8, 2002) (quoting *Obiajulu v. City of Rochester, Dep't of Law*, 166 F.R.D. 293, 295 (W.D.N.Y.1996)).

Weighing the four factors to determine whether a waiver will be found, we make the following overarching judgments. In terms of the reasonableness of Defendants' precaution not to disclose the documents, we note that none of the documents were marked "confidential" and were produced several times. The Defendants' subsequent justification on this reasonableness standard is lacking.[13] Although months had elapsed before Defendants were even aware that such disclosure had occurred, they claim that once they were notified that the documents were indeed in the hands of Plaintiffs they acted swiftly to reclaim the documents, which is uncontroverted by Plaintiffs. On this factor,

---

12. There are other criteria which a court may consider in ascertaining whether an "at issue" forfeiture is applicable: (1) the very subject of privileged communication [is] critically relevant to the issue litigated, (2) there is a good faith basis for believing such essential privileged information exists, and (3) there is no other source of direct proof. *Bank Brussels Lambert v. Credit Lyonnais (Suisse)*, 1995 WL 598971, at *5.

13. Most of the Defendants' arguments in this regard are misplaced. They wastefully spent more time casting aspersions upon what Plaintiffs may or may not have done with respect to these documents and Plaintiffs' production of documents, rather than focus on justification for their omissions. They would have been better served had they remained focused on the true issue at hand. If Plaintiffs were not properly complying with discovery, Defendants should have sought the court intervention.

the Court gives Defendants the benefit of the doubt.

Next, in terms of the volume of documents, we remain uncertain as to the overall size of the document production, but we know that the Privilege Logs list approximately 200 documents. Considering the nature of this litigation, we presume that a voluminous set of documents were disclosed, nonetheless, we are now tussling over just three purportedly privileged documents. In this respect, we further know through Defendants' admission that multiple copies of the documents have been forwarded to Plaintiffs, but they also proffer a justification or an excuse. That justification claims that one set of documents was sent redacted; then, after a stipulation between the parties or a protective order, the previous production was sent again, this time unredacted. Yet, not all productions are accounted for by this explanation because the Court counted, at least, three different sets for the same documents. Nonetheless, if this is the case, the dispute over three documents may minimize the notion of extreme carelessness to one of probable inadvertence.

Lastly, which weighs most favorably for the Defendants, there may be only limited prejudice to Plaintiffs. Although this may be an overall view, we will still, nevertheless, scrutinize the three documents in the framework of the "carelessness" balancing test. Each document will be judged under its own circumstances and merit.

### 1. Cable Operator Letter

There is an undated letter, apparently a draft, which will be referred to as the cable operator letter, inasmuch as the subject matter of the letter identifies the potential audience to which it would be addressed. The author of this letter is not identified on the letter. Plaintiffs presumed that it was drafted by Defendant Santiago but we now know that Roger Kinsey, Assistant Attorney General ("AAG"), drafted this letter. Plaintiffs assert *seriatim* that any privilege that may attach to this letter is waived because of the careless way it was produced and, moreover, the letter raises an at issue waiver. The at issue waiver involves the contention that Defendants have placed the subject matter of the draft letter at issue with their qualified immunity defense.

Attorney Kinsey provided to this Court, *in camera*, a detailed affirmation explaining how and why such composition came into existence. Kinsey avers that during the initial stages of this litigation, Plaintiffs approached Defendants to engage in settlement negotiation. Immediately after the District Judge granted a preliminary injunction in this case, he thought that such settlement would invariably include a retraction letter to various cable operators, so he drafted such a proposed letter. However, interest in settlement faded. Kinsey continues asseverating that he placed a version of this draft, into a manila folder marked "Versions Of The Letter," that contained copies of the August 31, 2005 Letter, some of them marked up. It was the manila folder with a wayward copy of the cable operator letter which was inadvertently disclosed therein that was shared with Plaintiffs. It is Kinsey's conviction that this draft letter constitutes work product for the perceptible reason it was meant for settlement purposes only. This draft was also presented to Defendant Santiago at her deposition by Plaintiffs. Obviously, from the record provided, Santiago could not identify the document and was unaware of its intended purpose, though she could surmise such purpose after reading it during the deposition.

This Court accepts Kinsey's affirmation that: (1) he is the author; (2) the intended purpose of the letter was to facilitate settlement; (3) although not employing the words confidential, the draft was placed in a folder in such a way that it was meant to be considered confidential and not revealed to his adversary; and (4) Santiago had not seen the document before. Knowing that Kinsey is an attorney, we find that the draft letter contains impressions and strategies of this lawyer, and, therefore, work product, which did not lose its cloak of protection solely because the matter may have been discussed with his clients. Further, we find, as to this draft, that the disclosure was not made voluntarily and weighing the four factors, the equities tilt in favor of Defendants, primarily because

of the element of overarching fairness; the document was not carelessly disclosed.

Plaintiffs are grasping at straws by postulating that the document has been placed at issue through the Defendants' assertion of the qualified immunity defense. No interpretation of the circumstances support such reasoning. First, neither the document itself nor any notation thereon mentions any qualified immunity defense [14] and the content of the draft is not a contention at issue. Second, this is a draft intended solely for the purpose of settlement, which ostensibly is legal strategy, and it had not been presented in any pleading or motion to a court. This proposed prophylactic remedy has not been placed in issue. Thus, it has not be interjected into this litigation in such a matter that it places itself, under the Fairness Doctrine, diametrically opposite to the Defendants' stated defense of qualified immunity. Third, Plaintiffs extrapolate that the content of Sorenson's email, dated September 7, 2005, *see infra* Part II.B.2, is an admission relevant to Defendants' claim of qualified immunity. Defendant Sorensen's role and purported admissions, if any, are not pertinent to this inquiry. Fourth, Plaintiffs presented the draft to Santiago at her deposition, which she acknowledged that she had not seen before. Sorensen's and Santigao's purported role is totally irrelevant to this critique. Such disclaimer and lack of recognition by either of them does not amount, under any reasonable view, a waiver, of any sort, of the privilege. And, fifth, the assertion that the "draft letter at issue raises questions of whether at least someone at the CPB, perhaps its counsel, held the view that the August 31, 2005 letter,

[the heart of this litigation] was potentially coercive and violative of Mr. Trudeau's First Amendment rights," is untenable in light of the facts and circumstances shared with the Court. Because this draft letter was contemplated in terms of settlement, its relevance at trial, or even as it may pertain to the qualified immunity defense, is dubious at best. Settlement matters are not interposed at trial. In the total scheme of events, Defendants have not wielded this document as both a shield and a sword. In sum, we find that this document is work product, the work product doctrine has not been waived, and the document should be returned to Defendants. *See supra* Parts II.B.2 & 4.b.

### 2. Jon Sorenson's Email, dated September 7, 2005

■ Applying the flexible balancing test to this document militates against Defendants' protestation that this confidential document was not waived, except for the overwhelmingly conspicuous nature of the email. Without question, this email is a review of Judge Sharpe's ruling and a legal strategy discussion between CPB's managers and their interagency counsel, Lisa Harris. A plain reading of this document transmits but only one interpretation—that it is either an attorney-client or deliberative process discussion, the absence of an attorney-client privileged notation thereon notwithstanding. *Export–Import Bank of United States v. Asia Pulp & Paper Co., Ltd.*, 232 F.R.D. 103, 112 (S.D.N.Y.2005). In our view, Plaintiffs had, or should have, realized its transparent nature, and immediately held the document as

---

**14.** Qualified immunity will shield "government officials from liability for civil damages when their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *African Trade & Info. Ctr., Inc. v. Abromaitis*, 294 F.3d 355, 359 (2d Cir.2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)); *see also Mollica v. Volker*, 229 F.3d 366, 370 (2d Cir.2000). This also applies "insofar as it was objectively reasonable for [the government officials] to believe that their acts did not violate those rights." *Mollica*, 229 F.3d at 370 (internal quotation marks and citations omitted); *see also Anderson v. Creighton*, 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). The objectively reasonable test will

be met " 'if [officials] of reasonable competence could disagree' on the legality of the defendant's actions." *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir.1995) (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) (further citation omitted)). In order for the constitutional right to be clearly established, three elements must be met: "1) ... [that] the right in question [be] defined with reasonable specificity; 2) [that] the decisional law of the Supreme Court and applicable circuit court support the existence of the right in question; and 3) [that] under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful." *Mollica*, 229 F.3d at 371 (internal quotation marks and citations omitted) (alterations in original).

confidential for further discussion with Defendants before taking full advantage of the disclosure misadventure.[15] And, yet, the fulcrum of this balancing test leans heavily in favor of a waiver because of the extreme carelessness on the part of the Defendants. There are four iterations of this documents disclosed to Plaintiffs, with only one being served pursuant to a protective order. We find that Defendants did not employ reasonable precaution in this situation, the volume of documents does not provide sufficient cover for Defendants' error, and Defendants' reaction to the fortuitous disclosure evidently was not prompt enough, since the proverbial cat is out of the bag, and the damage has been done. *See supra* note 15; *see also* Part II.B.3.a. These facts and the reasonable inferences lead to only one conclusion, that is, this document's confidentiality is waived. *Atronic Int'l, GMBH v. SAI Semispecialists,* 232 F.R.D. 160, 161 (E.D.N.Y.2005) (finding that two emails, although privileged, were, nonetheless, waived due to inadvertent and careless disclosure).

Before we move on to the next document, we are required to make the following observations as to this email. First, this email is a legal strategy/settlement/deliberative process document, which has no relevance, or even admissibility at trial. We do not find persuasive Plaintiffs' perspective that this document constitutes an at issue waiver. It does not and, in essence, it is of nominal legal value. Plaintiffs' utilization of the document has already visited prejudice to the Defendants, which cannot be retracted, however, there is little fear that our ruling finding a waiver will generate further injury to them. *See supra* note 15.

### 3. August 30, 2005 Letter

 This Letter, addressed to Roger Kinsey, was drafted with Defendant Santiago's initials over the signature line. We are uncertain whether such correspondence was ever forwarded to Kinsey. The apparent nature of the document is similarly vague. Deliberating solely upon the content set forth within the four corners of this document, it is not manifested therein that this document qualifies as an attorney-client privileged document. Weighing the criteria used to determine if a communication is truly an attorney-client document, we find that it does not. *United States v. Int'l Broth. of Teamsters,* 119 F.3d 210, 214 (2d Cir.1997).

This document does not seek any "fully informed" legal advice. Rather, the document foretells CPB's then future action, and thus Santiago, the client, is merely stating facts. Stating facts to an attorney does not deserve confidentiality. *See supra* Part II.B.2. There is no indicia which would indicate that this correspondence is being made in confidence. As we all know, not every correspondence forwarded to an attorney from her clients is cloaked with the privilege. *Id.* Based upon these findings alone, we declare that this document is not entitled to the attorney-client privilege, which finding obviates the need for us to ponder whether the privilege was waived. Therefore, we find that this document need not be returned to Defendants. *Id.*

---

**15.** The virtual horse has already left the barn tolling improbable consequences upon the Defendants. Plaintiffs abruptly and shrewdly shared this email, a document received in discovery, openly and notoriously with cable operators knowing full well that this is an internal agency discussion between agency heads and counsel. In the caption, immediately following Lisa Harris' name, is the nomenclature "counsel" ("Lisa Harris/COUNSEL/NYSCPB"). It is unfathomable that Plaintiffs could not have perceived that this was not possibly a privileged document. There is no plausible reason why they could not have waited until they confirmed or refuted the privileged character of the email before sharing it with the world. The rush to judgment, without inquiry of the Defendants, to create favorable inclinations with the cable companies and take advantage of this inadvertence, was in violation of the spirit of ABA Formal Opinion 05–437 and, in this Court's view, rather unctuous practice. Rather than wait and determine the nature and aim of this email, Plaintiffs thrusted this email into the public domain, solely for the purpose of gaining sway over these cable operators. In their zeal, they identified one of the Defendants as the author, probably in order to heighten its value. There should be some type of rejoinder to Plaintiffs' tactical move. They may not be subject to sanctions, since ABA Formal Opinions are solely guidance, but neither can this act be countenanced. An admonishment, albeit through a footnote, is fitting.

## II. CONCLUSION

Accordingly, it is hereby

**ORDERED,** that Defendants' Application for Plaintiff Trudeau's tax return is **denied,** at this time, however, Trudeau shall provide to the Defendants a net worth statement listing assets and liabilities, and gross and net income for the years 2003 to 2005; and it is further

**ORDERED,** that Defendants' Application for all information pertaining to the charitable foundation is **denied,** however, Trudeau shall disclose the extent of his contribution into this foundation and the nature of its primary source. In the event Trudeau does not make any contribution to this foundation, he shall so advise the Defendants; and it is further

**ORDERED,** that Defendants' Application for documents related to the *Trudeau v. Jordan Whitney* litigation is **granted;** and it is further

**ORDERED,** that Defendants shall provide Plaintiffs with a new privilege log consistent with this Memorandum–Decision and Order; and it is further

**ORDERED,** that, based upon the Court's finding that the cable operator letter is privileged and said privilege was not waived, Plaintiffs shall return to the Defendants the cable operator letter; and it is further

**ORDERED,** that Plaintiffs do not have to return the Sorenson email and the August 30, 2005 letter; and it is further

**ORDERED,** that the Clerk of the Court **shall file under seal** Plaintiffs' Letter–Brief, dated April 27, 2006, with Attachments, Defendants' Letter–Brief, dated May 10, 2006, with Attachments, and Roger Kinsey, Esq., Affirmation, dated May 10, 2006, with Attachments; and it is further

**ORDERED,** that the Clerk of the Court shall enter on the case docket Defendants' Letter–Brief, dated March 29, 2006, and Plaintiffs' Letter–Brief, dated April 12, 2006; and it is further

**ORDERED,** that all mandates herein shall be complied with within thirty (30) days of the date of this Order.

IT IS SO ORDERED.